**Philip J. DRINKWINE and Sac Enterprises, Inc., Plaintiffs-Appellants,**

**v.**

**FEDERATED PUBLICATIONS, INC., a Delaware Corporation and Gannett Co., Inc., a Delaware corporation, Defendants/Respondents.**

**Nos. 84–4193, 84–4363.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 5, 1985.

Decided Oct. 22, 1985.

Designated for Publication Jan. 16, 1986.

James E. Risch, Risch, Goss, Insinger, & Salladay, Boise, Idaho, for plaintiffs-appellants.

P. Craig Storti, Robert L. Bilow, Edwin V. Apel, Jr., Hawley, Troxell, Ennis, & Hawley, Boise, Idaho, for defendants, respondents.

Before WRIGHT, PREGERSON, and ALARCON, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

In 1977, Drinkwine started a business of preparing and selling local display advertising to merchants. The ads were printed in a separate publication called the "shopper" and then inserted and distributed with Boise's local paper, the Idaho Statesman.[1]

Drinkwine went out of business and sued the Statesman's publisher, Federated Publishers, Inc., and Federated's parent, Gannett Co., Inc., alleging antitrust violations. The district court directed a verdict for the defendants because Drinkwine failed to produce sufficient admissible evidence of liability and causal damages. We affirm.

## FACTS

From November 1977 to June 1979, Drinkwine produced 27 shoppers for four Boise merchants associations.[2] The first two shoppers were circulated in two weekly papers, the remainder were distributed in the Statesman.

From the beginning, the Statesman competed heavily for the advertising business the merchants associations represented.

---

1. The Statesman is the only daily paper in Ada County. It had a daily circulation in 1978 and 1979 of 31,000, or 63% of the county population.

2. The four merchants associations were the Westgate Merchants Association (the "WMA"), the Downtown Merchants Association the

"DMA"), the Fairview Merchants Association (the "FMA"), and the Vista Village Merchants Association (the "VVMA"). In June 1979, Drinkwine accepted a job as Promotion Director of the WMA.

At a January 1978 WMA breakfast meeting paid for by the Statesman, Drinkwine and a representative for the Statesman both solicited the January shopper. In March, Rick Feuille, a Statesman representative, offered the DMA and the WMA a lower rate than that published on its rate card, a shorter lead time (an important business incentive for the merchants) and one free inch of ad space for every 11 inches purchased.

In September, after Drinkwine's first twenty-page shopper was distributed, Feuille told Drinkwine that the shopper must be at the Statesman seven days before distribution. Drinkwine had previously delivered the shopper two to three days prior to distribution.

In November or December, Feuille notified the promotion director of the WMA and the president of the DMA and FMA that, because Drinkwine was behind in his payments to the Statesman, the Christmas shopper might not be delivered.

Both Drinkwine and the Statesman presented shopper plans to the DMA in March, 1979. The DMA decided to give Drinkwine its advertising for the remainder of 1979. Nevertheless, Drinkwine and the Statesman competed for a June 14th shopper. The DMA split its advertising between the two. Drinkwine claims that this precluded his publishing a shopper at all because he received too few ads. He withdrew from publishing, and the DMA placed all its ads with the Statesman.

On June 18, the Statesman changed its policy and no longer allows pre-printed inserts like the shopper unless the printing is done by the Statesman except those prepared by national producers.

## ANALYSIS

### I. *Antitrust Injury*

Drinkwine claims that the Statesman has committed the following antitrust violations: (1) monopolization, (2) attempted monopolization, (3) tying, and (4) refusal to deal. The district court granted summary judgment for the defendants on the tying and monopolization claims. After the plaintiff presented his case to the jury, the district court directed a verdict for the Statesman because Drinkwine had failed to produce sufficient evidence of damages and liability. Because we decide this appeal on the liability issues, we do not reach the damages issues.

A directed verdict under Fed.R.Civ.P. 50(a) will be sustained on appeal if the "evidence permits only one reasonable conclusion as to the verdict." *Tibbs v. Great American Ins. Co.*, 755 F.2d 1370, 1376 (9th Cir.1985) (quoting *California Computer Products, Inc. v. IBM Corp.*, 613 F.2d 727, 733 (9th Cir.1979); *Othman v. Globe Indemnity Co.*, 759 F.2d 1458, 1463 (9th Cir.1985) (appellate court has the same role as the lower court in review of directed verdict). Examining the evidence in the light most favorable to Drinkwine, substantial evidence must still exist in his favor. *Othman*, 759 F.2d at 1463.

### A. *Monopolization/Refusal to Deal*

The elements of a monopolization offense are: monopoly power,[3] the willful

---

**3.** Drinkwine has not sufficiently demonstrated his market. He attempts to show that the relevant product (service) market is the "sale and preparation of local display advertising which is distributed in a daily newspaper." Appellants' Brief at 36. The district court assumed that the Statesman had monopoly power because it was essentially the only daily paper in Ada County. Evidence in the record, however, indicates that the merchants saw door-to-door delivery, direct mail, and the weekly papers as viable substitutes for daily newspaper delivery.

Under the "reasonable interchangeability for the same or similar uses" test, *Los Angeles Memorial Coliseum Comm'n v. N.F.L.*, 726 F.2d 1381, 1393 (9th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984), alternate delivery systems should have been examined. Under the cross-elasticity of demand test, the responsiveness of sales in one product to price changes in another should have been undertaken. *Id.* Market power exists whenever prices can be raised above the competitive market levels. *Jefferson Parish Hospital v. Hyde*, 466 U.S. 2, —— n. 46, 104 S.Ct. 1551, 1566 n. 46, 80 L.Ed.2d 2 (1984). In this case, it appears that the merchants were sensitive to the Statesman's cost of delivery and willing to change to alternate sources in response to price increases.

acquisition or maintenance of that power, and causal antitrust injury.[4] *Foremost Pro Color, Inc. v. Eastman Kodak Co.,* 703 F.2d 534, 543 (9th Cir.1983), *cert. denied,* 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984). Intent must also exist but is subsumed in an analysis of the exclusionary conduct. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* ⸺ U.S. ⸺, 105 S.Ct. 2847, 2857–58, 86 L.Ed.2d 467 (1985).

■ The test of willful maintenance or acquisition of monopoly power is whether the acts complained of unreasonably restrict competition. *California Computer Products,* 613 F.2d at 735–36. Drinkwine complains that the Statesman: (1) changed its prices before and after he went out of business, (2) phoned the merchants to complain about Drinkwine's financial problems and warn that his shoppers may not be distributed unless he paid his bills, (3) refused to give him a contract rate, (4) increased lead time from delivery to distribution, and (5) refused to take shoppers from local publishers after June 18, 1979.

The record does not support the change-in-price argument. The benefits and prices the Statesman offered were the same before and after Drinkwine went out of business.

■ Even if Drinkwine established that the Statesman juggled its prices depending on competition, it is insufficient to show predatory conduct. "Pricing is predatory only where the firm foregoes short-term profits in order to develop a market position such that the firm can later raise prices and recoup lost profits." *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1031 (9th Cir.1981) (quoting *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848, 856 (9th Cir.1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978)), *cert.*

*denied,* 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982). Even a dominant supplier can lower its prices to compete as long as its prices remain profitable. *California Computer Products,* 613 F.2d at 741–42; *Hanson v. Shell Oil Co.,* 541 F.2d 1352, 1358–59 (9th Cir.1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977).

■ Drinkwine made no effort to introduce any evidence on defendants' marginal, average variable or average total costs. Absent evidence that the Statesman's pricing was below its average total cost, he must prove by clear and convincing evidence that its pricing policy unreasonably restricted competition. *Transamerica Computer Co. v. IBM Corp.,* 698 F.2d 1377, 1388 (9th Cir.), *cert. denied,* 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983). Since the Statesman's prices were always above Drinkwine's, this proof must fail. *See Murphy Tugboat Co. v. Crowley,* 658 F.2d 1256, 1259 (9th Cir.1981), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982).

■ The phone calls to the merchants hurt Drinkwine but were in the merchants' interest. Since the merchants were likely to blame the Statesman if it refused to deliver their advertisements, the Statesman had a legitimate interest in notifying them of that possibility.

Drinkwine complains that he was not given the lower contract rate. The evidence clearly shows that he never qualified for it. It also shows that the seven-day lead time was an established Statesman policy in October 1977.

■ Assuming that the Statesman is a monopolist, its decision to refuse to accept shoppers from independent producers is predatory if it is an attempt "to exclude rivals on some basis other than efficiency." *Aspen Skiing,* 105 S.Ct. at 2859. The be-

---

4. The Supreme Court recently addressed monopolization in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* ⸺ U.S. ⸺, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). It approved a jury instruction explaining the two elements of monopolization: "(1) monopoly power in the relevant market, and (2) the willful acquisition, maintenance or use of that power by anticompetitive or exclusionary means or for anticompetitive or exclusionary purposes." *Id.,* 105 S.Ct. at 2854. The additional element of causal injury is not inconsistent with this two-prong test.

havior must be analyzed for its effect on consumers, competitors, and competition. *Id.*

The effect on consumers, the merchants, is not detrimental because the merchants have competitive alternate distribution channels. *See* footnote 3, *supra.*

The effect on Drinkwine is that he could not distribute his shopper through the Statesman, but he too had alternate distribution routes.

■ Determining the effect on competition requires analysis of the Statesman's business justification and the effect of the decision on the Statesman. *See Aspen Skiing,* 105 S.Ct. 2860–62. Given the Statesman's desire to control quality and its problems with collecting from local competitors, the business justifications appear valid. Drinkwine argues that the Statesman was merely trying to make more money. Even that motive is consistent with competition and the reasoning in *Aspen Skiing.*[5] *See* 105 S.Ct. at 2861 (desire to hurt competitor in part shown by refusing to accept its competitor's coupons even though that "would have provided it with immediate benefits ...").

As the Supreme Court recently said, The conduct of a single firm is governed by § 2 alone and is unlawful only when it threatens actual monopolization. It is not enough that a single firm appears to "restrain trade" unreasonably, for even a vigorous competitor may leave that impression. For instance, an efficient firm may capture unsatisfied customers from an inefficient rival, whose own ability to compete may suffer as a result. This is the rule of the marketplace and is precisely the sort of competition that promotes the consumer interests that the Sherman Act aims to foster. In part because it is sometimes difficult to distinguish robust competition from conduct with long-run anti-competitive effects, Congress authorized Sherman Act scrutiny of single firms only when they pose a

danger of monopolization. Judging unilateral conduct in this manner reduces the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur.

*Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984) (footnotes omitted).

■ The other acts complained of, competing for a June, 1979 shopper, paying for breakfast for the WMA and soliciting their business, etc., are all legitimate means of competing.

### B. *Attempt to Monopolize*

■ Three interrelated elements must exist to support an attempt to monopolize claim: specific intent to monopolize, predatory or anticompetitive conduct, and a dangerous probability of success. *Airweld, Inc. v. Airco, Inc.,* 742 F.2d 1184, 1192 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985); *Williams Inglis,* 668 F.2d at 1027.

Specific intent was recently reaffirmed as an element of an attempt violation. *Aspen Skiing,* 105 S.Ct. at 2857. It was not explained other than as "an intent which goes beyond the mere intent to do the act." *Id.* (quoting *United States v. Aluminum Co. of America,* 148 F.2d 416, 432 (2d Cir.1945)).

■ This circuit has explained that intent may be inferred from "either (1) conduct forming the basis for a substantial claim of restraint of trade, or (2) conduct that is clearly threatening to competition or clearly exclusionary." *Williams Inglis,* 668 F.2d at 1029 & n. 11. The focus must be on proof of unfair or predatory conduct. *Airweld, Inc.,* 742 F.2d at 1192. That conduct, and hence the specific intent to monopolize, is missing here.

### C. *Tying*

■ To qualify for the per se analysis against tying, Drinkwine must establish that Statesman is selling two separate products and using its market power in one

---

**5.** This case is factually distinguishable from *Aspen Skiing* because there the practice originated in a competitive market and the change oc-

curred after Aspen Skiing Co. had established a monopoly. 105 S.Ct. at 2858.

to force purchase of another. *See Jefferson Parish Hospital v. Hyde*, 466 U.S. 2, 18, 26, 104 S.Ct. 1551, 1561, 1566, 80 L.Ed.2d 2 (1984).

Whether one or two products is involved is a question of character of demand. *Id.*, 466 U.S. 2, 19, 104 S.Ct. 1551, 1562, 80 L.Ed.2d 2. Since the production and distribution of the shopper could be provided and selected separately, they can be characterized as two separate products.

No forcing is present, however, if distribution alternatives exist, because no restraint of competition occurs in that market. *See id.*, 466 U.S. 2, 26, 104 S.Ct. 1551, 1566, 80 L.Ed.2d 2. The merchants can and do consider other methods of delivery, comparing those methods' effectiveness and cost to the Statesman's. *See* footnote 3, *supra.* In this case, no per se violation has occurred.

*Jefferson Parish* requires that this arrangement be examined for unreasonable restraint on competition. 466 U.S. 2, 29, 104 S.Ct. 1551, 1567, 80 L.Ed.2d 2. As in *Jefferson Parish*, though, there is insufficient evidence to show that the price, quality, supply or demand for either product has been adversely affected.

### II. *Exhibit 304*

Drinkwine asserts on appeal that the district court erred in excluding Exhibit 304. It was a box of inserts containing national advertising distributed by the Statesman. It was irrelevant because the suit dealt only with local advertising, and it was repetitive as the Statesman admitted that it accepted national ads. The district court did not abuse its discretion in refusing to admit the exhibit. *See United States v. Hearst*, 563 F.2d 1331, 1348–49 (9th Cir.1977) (no abuse when evidence is cumulative), *cert. denied*, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978).

### III. *Dismissal of Gannett Co., Inc.*

Drinkwine also asserts the district court improperly dismissed the defendant Gannett Co. before trial.

Gannett cannot be sued directly simply because it owns Federated stock.

Drinkwine has not shown that Federated's corporate entity has been disregarded nor has he shown that Federated was undercapitalized. *See Pierson v. Jones*, 102 Idaho 82, 625 P.2d 1085, 1087 (1981).

Simply stated, there is no support in the record to impose liability on Gannett. Therefore, the district court's summary judgment was proper.

### IV. *State Law Claims*

The court originally denied summary judgment for defendants on the state law claims. In its oral ruling, it equivocated between dismissing for lack of pendent jurisdiction and entering judgment for defendants. The entire complaint was dismissed on November 7.

Because the facts are so tenuous, no purpose would be served by another trial. Therefore, we affirm the dismissal on the merits. *See Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 903–04 (9th Cir.1983) (no abuse of discretion to retain jurisdiction over pendent claims when federal claims dismissed if court and parties have spent considerable time on state claims).

AFFIRMED.

