**HIGH TECHNOLOGY CAREERS,**
a California partnership,
Plaintiff–Appellant,

v.

**SAN JOSE MERCURY NEWS,**
a California corporation,
Defendant–Appellee.

No. 91–16526.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 1, 1993.

Decided June 24, 1993.

John I. Alioto, Michael J. Bettinger, Alioto & Alioto, San Francisco, CA, for plaintiff-appellant.

John E. Sparks, Antje J. Johnson, and Ronald S. Wynn, Brobeck, Phleger & Harrison, San Francisco, CA, for defendant-appellee.

Before: FARRIS, POOLE and WIGGINS, Circuit Judges.

FARRIS, Circuit Judge:

High Technology Careers appeals the district court's summary judgment in favor of the San Jose Mercury News in HTC's antitrust action alleging that Mercury News violated the Sherman Act, 15 U.S.C. § 2, by refusing to continue to publish HTC's advertising insert. We have jurisdiction of the timely appeal pursuant to 28 U.S.C. § 1291. We reverse.

## FACTS

The San Jose Mercury News is a daily newspaper published in San Jose, California. Mercury News possesses 85% of the market for daily newspapers in Santa Clara County, America's leading county in high-tech employment and the heart of Silicon Valley. In 1990, Mercury News carried more than sixteen million lines of recruitment advertising, significantly more than any other newspaper in the country. Mercury News proclaims that it is "the world's leading recruitment advertising newspaper" and "America's # 1 newspaper in classified employment advertising."

In 1982, Rodney Lake and Fred Faltersack formed Westech Expocorp, which sponsored high-technology job fairs in Silicon Valley. The next year, Lake, Faltersack, Gregory Bahue, and Paul Burrowes formed High Technology Careers to advertise Westech's job fairs.

In 1984, HTC proposed that Mercury News accept a preprinted, presorted advertising insert that would be placed in the Sunday edition of the Mercury News preceding the Monday–Tuesday job fairs. Mercury News normally does not carry locally brokered preprint advertising, which is solicited by a third party rather than directly by the newspaper's classified advertisements de-

partment. Mercury News nevertheless decided to accept the HTC insert because it would generate substantial net revenue in the form of insert fees, and Mercury News could avoid the potential threat of direct mail.

Mercury News carried the insert three times a year in 1984 and 1985 and six times a year between 1986 and 1990. The insert generated advertising revenue for Mercury News of more than $940,000. HTC never missed a payment despite rate increases of as much as fifty-six percent in 1989.

In 1986, Mercury News contacted the Equal Employment Opportunity Commission and the Fair Employment Practices Commission to determine whether direct mailing of newspaper recruitment advertising would serve as a practical and legal alternative to a newspaper insert. Mercury News took this unusual action to discover potentially damaging information to use against HTC in a future lawsuit.

In July 1990, Mercury News informed HTC that it would no longer accept the insert, and declined to give HTC any reason or explanation for the decision. In a one sentence letter to HTC, Mercury News stated that "The San Jose Mercury News has decided not to accept Westech's printed inserts for distribution in 1991." Mercury News instructed its employees that "notification was given without explanation to Westech and it is extremely important that no one at the Mercury News be drawn into a conversation about why we are refusing to accept these preprints." In a later document, Mercury News expressed the "[n]eed to come up with answers why we're not accepting insert. (All use same reason)." Eventually, Mercury News gave no official reason to inquiring advertisers. It merely refused to explain.

HTC brought this action, alleging that Mercury News's conduct was anticompetitive, in violation of section 2 of the Sherman Act. Following discovery, Mercury News moved for summary judgment, arguing that its decision to terminate HTC was not predatory because there were legitimate business justifications for refusing to carry the insert.

Mercury News argues that is has three valid business justifications for its decision to terminate the insert: 1) to control the editorial content of its own paper; 2) to eliminate lost revenue potential; and 3) to prevent HTC from free riding on Mercury News's reputation. The district court found that there was credible evidence that the first business reason, editorial control, was pretextual and therefore did not grant summary judgment on this basis. The court never addressed the third reason, elimination of free riding, as it is raised now for the first time on appeal. It found that Mercury News's claim of lost revenue was a legitimate business justification precluding antitrust liability, and granted Mercury News's motion for summary judgment.

## STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo. *City of Vernon v. Southern Cal. Edison Co.*, 955 F.2d 1361, 1365 (9th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 305, 121 L.Ed.2d 228 (1992). We must determine, viewing the evidence in the light most favorable to HTC, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *See Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir.1989). Summary judgment is disfavored in antitrust cases. *Christofferson Dairy, Inc. v. MMM Sales, Inc.*, 849 F.2d 1168, 1171 (9th Cir. 1988).

## DISCUSSION

### I. *Sherman Act, Section 2*

HTC claims that it has presented genuine issues of material fact as to whether Mercury News has monopolized the recruitment advertising market in Silicon Valley in violation of Section 2 of the Sherman Act. The offense of monopolization under Section 2 of the Sherman Act has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acu-

men, or historical accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

### A. *Monopoly Power in the Relevant Market*

■ Monopoly power is the "power to control prices or exclude competition" in the relevant market, *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956), and exists whenever prices can be raised above the competitive market levels. *Jefferson Parish Hosp. v. Hyde*, 466 U.S. 2, 27 n. 46, 104 S.Ct. 1551, 1566 n. 46, 80 L.Ed.2d 2 (1984). In order to determine whether Mercury News possesses monopoly power, the trier of fact must first determine the relevant market. *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 726 F.2d 1381, 1392 (9th Cir.), *cert. denied*, 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984). Defining the relevant market requires identifying those competitors who have the actual or potential ability to deprive each other of significant levels of business. *Pay 'N Pak*, 875 F.2d at 1374.

HTC claims that the relevant market includes all high technology employment advertising in Santa Clara County daily newspapers. Using this definition, Mercury News possesses an 85% market share. Mercury News claims that the relevant market includes all newspapers, scientific journals, computer magazines, direct mail, radio and television in the ten-county area surrounding Santa Clara County. Using this definition, Mercury News possesses less than 30% of the market.

■ The process of defining the relevant market is a factual inquiry for the jury. *Oahu Gas Service, Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 363 (9th Cir.), *cert. denied*, 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). The court may not weigh evidence or judge witness credibility. *Syufy Enter. v. American Multicinema Inc.*, 793 F.2d 990, 994 (9th Cir.1986), *cert. denied*, 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987).

■ HTC and Mercury News have each presented strong evidence and compelling arguments to support their respective definitions of the relevant market. "The proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers." *Eastman Kodak Co. v. Image Technical Servs., Inc.,* —— U.S. ——, ——, 112 S.Ct. 2072, 2090, 119 L.Ed.2d 265 (1992) (quoting *Grinnell*, 384 U.S. at 572, 86 S.Ct. at 1704). The district court properly found that it could not determine the relevant market on a motion for summary judgment.

### B. *Willful Maintenance or Acquisition of Monopoly Power*

The second element of a Section 2 claim is the willful acquisition or maintenance of monopoly power. *Grinnell*, 384 U.S. at 570, 86 S.Ct. at 1703. A monopolist cannot use its power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman Kodak*, —— U.S. at ——, 112 S.Ct. at 2090; *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948).

■ As a general rule, a monopolist has no duty to deal with its competitors. *Eastman Kodak*, —— U.S. at —— n. 32, 112 S.Ct. at 2091 n. 32. This rule is not absolute, however. A monopolist can refuse to deal with its competitors only if there are legitimate competitive reasons for the refusal. *Id.; See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602–605, 105 S.Ct. 2847, 2857–2859, 86 L.Ed.2d 467 (1985); *Oahu Gas*, 838 F.2d at 368 (rejecting "broad contention that the antitrust laws may never impose duties on a monopolist to aid its competitors").

■ Liability turns, then, on whether "valid business reasons" support Mercury News's decision to terminate the insert. *Aspen Skiing Co.*, 472 U.S. at 605, 105 S.Ct. at 2858. If there is a valid business justification for Mercury News's conduct, there is no antitrust liability. *Oahu Gas*, 838 F.2d at 369. Whether valid business reasons motivated a monopolist's conduct is a question of fact. *Eastman Kodak*, —— U.S. at ——, 112 S.Ct. at 2091; *Aspen Skiing*, 472 U.S. at 604–

05, 105 S.Ct. at 2858–59. We must determine whether HTC has offered sufficient evidence challenging each of Mercury News's claimed business justifications to survive summary judgment. *See Calculators Hawaii, Inc. v. Brandt, Inc.*, 724 F.2d 1332, 1339 (9th Cir.1983) (holding that plaintiff bears the burden of proving lack of legitimate business justifications in a Section 2 claim).

Mercury News contends that is has three valid business justifications for its actions: 1) to control the editorial content of its own paper; 2) to eliminate lost revenue potential; and 3) to prevent HTC from free riding on Mercury News's reputation.

### 1. *Control of Editorial Content*

■ Mercury News first asserts that it was justified in cancelling the insert in order to control the editorial content of its own paper. Mercury News claims that it was concerned that an independently published magazine 1) containing "second run syndicated features and canned editorial content" and 2) that caused "distribution and scheduling problems" threatened the "editorial integrity of its own newspaper."

The district court properly found that this proffered business justification is suspect. *See Mozart Co. v. Mercedes–Benz of North America, Inc.*, 833 F.2d 1342, 1349–52 (9th Cir.1987) (describing "skepticism" which "the quality control defense ... usually has been accorded"), *cert. denied*, 488 U.S. 870, 109 S.Ct. 179, 102 L.Ed.2d 148 (1988). Mercury News never complained to HTC about the content of the insert or about distribution and scheduling problems. Mercury News's editorial control justification appears inconsistent with the fact that Mercury News carries other inserts with substantive articles over which Mercury News exercises no editorial control. This evidence of pretext is sufficient to raise a genuine issue of material fact. *See Eastman Kodak*, — U.S. at ——, 112 S.Ct. at 2091 ("a reasonable trier of fact could conclude that Kodak's [quality justification] is pretextual"); *International Business Machines Corp. v. United States*, 298 U.S. 131, 139–40, 56 S.Ct. 701, 705, 80 L.Ed. 1085 (1936) (rejecting IBM's claim that it had to control the cards used in its machines to avoid "injury to the reputation of the machines and the good will of" IBM in the absence of proof that other companies could not make quality cards).

Mercury News's reliance on *Drinkwine v. Federated Publications, Inc.*, 780 F.2d 735 (9th Cir.1985), *cert. denied*, 475 U.S. 1087, 106 S.Ct. 1471, 89 L.Ed.2d 727 (1986) is misplaced. In *Drinkwine*, a preparer and seller of local display advertising printed an insert for distribution in the Statesman, the sole daily newspaper in Boise, Idaho. In less than two years, the Statesman distributed 25 inserts for Drinkwine, but competed heavily for the business from the beginning. After Drinkwine fell behind in its payments to the Statesman, the insert was cancelled and Drinkwine sued the Statesman, alleging antitrust violations. Affirming the district court's directed verdict for the newspaper, we held that "[g]iven the Statesman's desire to control quality and problems with collecting from local competitors, the business justifications appear valid."

Drinkwine failed to pay its bills. HTC paid its bills on time. The Statesman desired to control quality. On the record, there is at least a question regarding Mercury News's desire to control quality in the inserts that it accepts. *Drinkwine* is not dispositive.

### 2. *Elimination of Lost Revenue Potential*

■ Mercury News argues that it was also justified in cancelling the insert to eliminate lost revenue potential. The district court agreed and granted summary judgment, finding that the defense of lost revenue is supported by undisputed evidence. The district court erred. There exists a triable issue of fact as to the validity and sufficiency of this claimed justification.

Mercury News claims that carrying the insert cost the newspaper millions of dollars in lost revenue potential. Mercury News cites its own classified advertising department's revenue analyses from 1984 to 1990 estimating the additional revenue that would have been generated "if there was no High Tech insert." But Mercury News realized that complete elimination of HTC, not just

the insert, was the only way to recapture lost revenue potential: "The only way we might recapture some of the advertising is if there were NO High Tech Careers magazine." Unlike the Statesman in *Drinkwine,* which competed vigorously from the beginning for the insert revenue, Mercury News rejected strategic suggestions to "come up with a good, solid plan and give Westech some healthy competition." Early on, Mercury News merely waited "to see what the market does to Westech. They could go out of business."

Later, when it became clear that the insert was not going out of business, Mercury News arguably took a more active role:

> I believe it's too late to refuse the inserts—We've accepted them for so long it's almost like an "established past practice." If we went to court, it would cost us $$ and my gut feeling is we'd lose.... Why not keep jacking up the insert price and/or taking away the commission on the inserts?

Mercury News called for a plan to "minimize job fair exhibitors' ads in the Westech High Technology Careers publication ... [and] get most of the exhibitor advertising back into Mercury News Classified *without* discounting rates." Apparently, Mercury News wanted to increase its advertising revenue without competing with HTC, which admittedly had lower overhead than Mercury News.

At the same time Mercury News decided to cancel the insert, it was running advertisements proclaiming "SILICON VALLEY IS ALL OURS" and boasting that their "75.3% share of market" means that "[y]ou only need one newspaper buy to fill your recruitment requirements here."

Evidence presented by HTC raises a genuine issue of material fact as to whether Mercury News's lost revenue justification is pretextual.

At oral argument, Mercury News suggested that it was actually losing money from the insert because the newspaper's regular advertisers would switch to the lower cost insert just prior to the job fairs. HTC, however, has presented evidence that the Westech job fairs created *additional* advertising revenue for Mercury News. This, of course, will be the issue at trial. If Mercury News can prove its assertion, it should prevail. Its difficulty on appeal from the granting of summary judgment is that we must find unrebutted evidence in the record to substantiate its claim.

### 3. *Prevention of Free Riding*

Mercury News claims on appeal that its decision to terminate the insert was justified by a need to prohibit HTC from free riding on Mercury News's reputation. "This understanding of free-riding has no support in our caselaw." *Eastman Kodak,* —— U.S. at ——, 112 S.Ct. at 2092. The record suggests, but does not establish, that HTC paid for Mercury News's investment in capital and labor. *See Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 55, 97 S.Ct. 2549, 2560, 53 L.Ed.2d 568 (1977). HTC paid what it was asked to pay.

### *CONCLUSION*

The record satisfies us that HTC has made a legitimate challenge to the sufficiency and validity of Mercury News's lost revenue justification. There is a genuine issue of material fact as to whether Mercury News was losing money by carrying the insert. If Mercury News can prove that it was losing money because its regular advertisers were switching to the insert, it should prevail. On the other hand, if Mercury News simply failed to capture all of the additional advertising revenue generated by the Westech job fairs, the newspaper will not have established a legitimate business justification to shield it from Section 2 liability.

**REVERSED and REMANDED.** The district court may conduct further proceedings on the motion for summary judgment. If after such proceedings there remains a genuine issue of material fact on any of the three business justifications argued by Mercury News the matter should proceed to trial on the merits.