**FRICKE–PARKS PRESS, INC., Plaintiff,**

v.

**Ted Y. FANG, et al., Defendants.**

**No. C–00–3726 VRW.**

United States District Court, N.D. California.

April 13, 2001.

Daniel C. Girard, Mark Tamblyn, Gordon M. Fauth, Girard & Greene LLP, San Francisco, CA, for plaintiff.

James M. Wagstaffe, Michael Von Loewenfeldt, Timothy J. Fox, Kerr & Wagstaffe, San Francisco, CA, Sanford Svetcov, Milberg Weiss Bershad Hynes & Lerach LLP, San Francisco, CA, Susan K. Alexander, Milberg Weiss Bershad Hynes & Lerach LLP, San Francisco, CA, for Ted Y. Fang, Florence Fang, EXIN, Public Printing, Inc. and Pan Asia Venture Capital Corporation

John L. Fitzgerald, Andrew A. August, Pinnacle Law Group LLP, San Francisco, CA, for Gerard T. Diaz.

Thomas D. Nevins, Gary L. Halling, Michael W. Scarborough, Sheppard Mullin Richter & Hampton, San Francisco, CA, Lee Simowitz, Gerald A. Connell, Lee H. Simowitz, Baker & Hostetler, Washington, DC, Raoul D. Kennedy, Skadden Arps Slate Meagher & Flom LLP, San Francisco, CA, for Hearst Corporation.

## ORDER

WALKER, District Judge.

This case stems from a March 16, 2000, agreement between Hearst Communications, Inc and defendant ExIn, a limited liability corporation operated by defendants Florence Fang and her son, Ted Fang. The agreement called for Hearst to transfer certain assets associated with its Examiner newspaper and up to $66 million

over three years to ExIn. See *Reilly v. Hearst Corp.*, 107 F.Supp.2d 1192 (N.D.Cal.2000).

Plaintiff Fricke–Parks Press, Inc (FPP), a commercial printer of independent publications and periodicals in the San Francisco area, alleges that Hearst's deal with ExIn constitutes an unreasonable restraint of trade in violation of section 1 of the Sherman Act, 15 USC § 1, an unlawful combination or acquisition in violation of section 7 of the Clayton Act, 15 USC § 18, as well as a violation of certain state laws. FPP names as defendants ExIn, the Fangs, two companies the Fangs control, Public Printing, Inc (d/b/a Grant Printing) and Pan Asia Venture Capital Corp (collectively, the Fang defendants) and Gerald Diaz, a former employee of FPP who now works for Grant Printing. FPP is a competitor of Grant Printing.

Hearst moves to dismiss. Doc # 63. None of the other defendants joins in the motion. For the reasons set forth below, Hearst's motion is DENIED.

## I

In a FRCP 12(b)(6) motion, all material allegations in the complaint must be taken as true and construed in the light most favorable to the plaintiff. Dismissal is only appropriate when it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Indeed, "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (citation omitted).

The plaintiffs' version of the facts controls at this stage, *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir.1998), and thus the following is a summary of FPP's version from the first amended complaint (FAC).

FPP is a printing company operating in the San Francisco area that prints independent publications and periodicals. This market, which is restricted to the San Francisco area due to the delivery and distribution demands of the printing business, is very competitive and characterized by low profit margins. FPP competes in the commercial printing business against Grant Printing, one of the entities owned and operated by the Fangs.

For many decades, Hearst published the Examiner newspaper. The Examiner competed against the Chronicle newspaper, owned by the Chronicle Publishing Company (CPC). Since 1964, the two papers operated pursuant to a joint operating agreement by which the papers split their profits. In 1999, however, Hearst and CPC agreed that Hearst would acquire the Chronicle for $660 million.

The sale of the Chronicle required regulatory approval by the Department of Justice pursuant to 15 USC § 18a. Due to the symbiotic relationship between local newspapers and local politics, the parties to the Chronicle sale anticipated that the sale would face significant political scrutiny and significant opposition. On August 6, 1999, the day the Chronicle sale was announced, representatives from Hearst met with San Francisco Mayor Willie Brown, who had earlier expressed concern about the sale of the Chronicle. Mayor Brown warned that the sale of the Chronicle would threaten San Francisco's "third newspaper," a reference to the Independent, which was published by the Fangs. Soon thereafter, Hearst met with Mayor Brown, the Fang defendants and representatives of the DOJ. Hearst offered to provide favorable editorial coverage of Mayor Brown in exchange for his support of the

Chronicle sale. The Fang defendants offered to use their political influence to obtain regulatory approval of Hearst's acquisition of the Chronicle if Hearst would pay them a cash subsidy and transfer certain assets of the Examiner.

On March 16, 2000, Hearst agreed to pay ExIn up to $66 million over three years. The agreement did not obligate the Fang defendants to invest any capital in operating the Examiner or its printing plant. The March 16 agreement was not intended to preserve the Examiner as a newspaper in competition with the Chronicle, a metropolitan seven day a week daily. Instead, the March 16 agreement was intended to give the Fang defendants an advantage in competing for printing independent publications and periodicals in the San Francisco area thereby enabling them to establish a monopoly in that business. Hearst agreed to help the Fang defendants establish this position in printing independent publications and periodicals in exchange for the Fang defendants' political support for Hearst's acquisition of the Chronicle, as well as assurances that the new Examiner would not be operated in competition with the Chronicle, ensuring Hearst's metropolitan daily newspaper monopoly.

The resources required to print a newspaper can also be used to conduct a commercial printing business for publications and periodicals. At the time of the March 16 agreement both Hearst and the Fang defendants were engaged in or capable of engaging in a commercial printing business for publications and periodicals. The March 16 agreement provides the Fang defendants with the capability and incentive to use the assets (including the subsidy), ostensibly transferred for publishing the Examiner, in commercial printing jobs instead. Hearst and the Fang defendants are actual and potential competitors in commercial printing of independent publications and periodicals and in newspaper publishing. Their March 16 agreement divides or allocates these businesses between them, threatens to drive competitors, including FPP, out of the commercial printing field and allows the Fang defendants to raise prices, thereby injuring competition.

II

The FAC asserts three federal antitrust claims and four related state claims. Accepting these allegations as true, as the court must at this stage of the litigation, the court proceeds to analyze the claims against Hearst.

FPP asserts two federal and two state claims against Hearst: (1) contract and conspiracy to restrain trade in violation of section 1 of the Sherman Act, 15 USC § 1; (2) combination or acquisition of assets in violation of section 7 of the Clayton Act, 15 USC § 18; (3) combination in restraint of trade in violation of the Cartwright Act, CalBus & ProfCode § 16720; and (4) unlawful, unfair and fraudulent business practices in violation of the Unfair Competition Act, CalBus & ProfCode § 17200, et seq. In the motion to dismiss, Hearst argues: (1) FPP cannot demonstrate that the alleged transactions caused antitrust injury, an essential element for recovery under both of the federal claims asserted against it; (2) since the underlying unlawful objective of the agreement between Hearst and the Fang defendants is an attempt to monopolize the market utilizing predatory pricing, FPP must plead facts that support recoupment, which according to Hearst FPP has failed to do; and (3) FPP has alleged no plausible reason why Hearst would have the required "conscious commitment" to conspire with the Fang defendants for them to monopolize the commercial printing market.

Hearst argues that each of these reasons supports dismissal of FPP's claims against Hearst. The court analyzes the three arguments in turn.

## A

Hearst's first and most significant argument in support of its motion to dismiss is that FPP has not pled facts that show any antitrust injury has occurred. DefBr (Doc # 63) at 9–11. As Hearst correctly points out, the Supreme Court has made clear that an antitrust plaintiff "must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (emphasis in original); see also *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 113, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). In *Brunswick,* a bowling manufacturer acquired failing bowling centers that had defaulted on their payments for equipment. *Brunswick,* 429 U.S. at 479–80, 97 S.Ct. 690. The respondents were the owners of other bowling centers who sought relief under the antitrust laws on the grounds that they were denied anticipated increases in market shares and income by the acquired bowling centers kept in business by the manufacturer. *Id.* at 484, 97 S.Ct. 690. The Supreme Court rejected the idea that such losses were cognizable under the antitrust laws. *Id.*; see also *Lucas Automotive Eng'g v. Bridgestone/Firestone,* 140 F.3d 1228, 1233 (9th Cir.1998) (applying *Brunswick* ). In this regard, the Supreme Court stated that the "[r]espondents would have suffered the identical 'loss'—but no compensable injury—had the acquired centers instead obtained refinancing or been purchased by 'shallow pocket' parents ***." *Brunswick,* 429 U.S. at 487, 97 S.Ct. 690. *Cargill* involved a meat packer's challenge to an

other meat packer's acquisition of another meat packing firm. *Cargill,* 479 U.S. at 106–08, 107 S.Ct. 484.

Hearst attempts to analogize the facts of *Brunswick* and *Cargill* with the situation at bar. Hearst characterizes FPP's claimed injury as merely the loss or damage of having to compete with Grant Printing whose pockets have been deepened by the Hearst subsidy. DefBr (Doc # 63) at 11. Based on this characterization, Hearst contends that FPP's alleged injuries would have resulted whether the Fangs acquired financial backing from Hearst or from some other source, such as a bank or sale of unrelated real estate. *Id.* Hearst concludes, therefore, that the injury cannot be an antitrust injury, stating that the "increased competition" now facing FPP "does not turn on where or how the Fang defendants obtained the supposed monies used to fund the alleged below-cost bidding." *Id.*

But Hearst mischaracterizes the injuries alleged in the FAC. FPP does not complain of increased competition in the commercial printing market; rather, FPP complains about the division and allocation of the printing businesses effected by the March 16 transaction. The FAC alleges that the inputs used in publishing Hearst's newspaper are substitutes for those used by the Fang defendants in their commercial printing business. According to the FAC, the Fang defendants took over the Examiner with no intent of using their own assets or those transferred by the March 16 agreement, including the $66 million subsidy, in competition with Hearst's Chronicle; the Fang defendants allegedly have devoted those assets to build up a monopoly position in commercial printing. Although it is not spelled out in great detail, the FAC plainly distinguishes commercial printing of publications and peri-

odicals from metropolitan daily newspaper publishing.

The FAC thus alleges an allocation or division of markets, conduct long recognized as violative of section 1 of the Sherman Act. See *Addyston Pipe & Steel Co. v. United States,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899). Section 1 condemns market allocations of territories. *United States v. Sealy, Inc.,* 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967); *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951), other grounds overruled in *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). No less so, section 1 makes allocations of product markets illegal, even when such allocations are unaccompanied by price fixing or other restraints. *United States v. Topco Associates,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). The proscription against market allocations or divisions extends to potential as well as actual competitors. *Palmer v. BRG of Georgia, Inc.,* 498 U.S. 46, 49–50, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) ("Such arrangements are anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other."). The FAC alleges that Hearst and the Fang defendants are actual and potential competitors. FAC (Doc # 55), ¶ 40.

To be sure, the driver of the particular injury that FPP alleges is the Fang defendants' predatory pricing as enabled by the March 16 agreement. See FAC (Doc # 55), ¶ 47. But the allegations in the FAC are tantamount to a claim that the Fang defendants will by virtue of the March 16 agreement acquire market power in commercial printing that will enable them to reduce output and exert dominion over prices in that market while Hearst will acquire similar market power in metropolitan newspaper advertising. Since the antitrust laws "were enacted for 'the protection of *competition,* not *competitors,*'" *Brunswick,* 429 U.S. at 488, 97 S.Ct. 690 (emphasis in original) (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)), the antitrust laws recognize such claims as allegations of antitrust injury. *Brunswick* and *Cargill* lacked the facts of market allocation or division alleged in the FAC.

The injuries alleged flow from the allegedly unlawful conspiracy between Hearst and the Fang defendants that accompanied and prompted the March 16 agreement. FAC (Doc # 55), ¶¶ 42–47. The structure of the agreement, which reimburses the Fang defendants based on the costs they incur each year and lacks safeguards adequate to ensure they do not report non-Examiner costs, combined with the fact that Grant Printing's commercial printing business is profitable and expanding motivates the Fang defendants to engage in predatory pricing in that market. *Id.,* ¶¶ 44–45.

Financing from an alternative source would not have had the same effect. Under the March 16 agreement, there are incentives for the Fangs to "spend" as much money as possible in order to obtain the maximum subsidy from Hearst. *Id.,* ¶ 45. Hence, the agreement differs from a straight cash infusion that presumably would be devoted to whatever purpose proved most utilitarian to the Fang defendants. The alleged incentive under the March 16 agreement is to devote Hearst's money—at least, in part—to anticompetitive activities in the commercial printing business. Hearst's argument that the same injuries would have occurred if the Fangs acquired their money from a bank or sale of real estate thus misses the point of the allegations at bar.

Hearst also takes issue with FPP's assertion that the March 16 agreement lacks safeguards adequate to ensure the Fang defendants do not report non-Examiner costs for reimbursement. In this regard, Hearst points to the written agreement, Nevins Decl (Doc # 64), Exh 1, which the court may consider because FPP implicitly references it in the FAC and does not challenge its authenticity. *Parrino v. FHP, Inc.*, 146 F.3d 699, 705–06 (9th Cir. 1998); *Branch v. Tunnell*, 14 F.3d 449, 453–54 (9th Cir.1994). The document defines "reimbursable costs" and requires the Fang defendants to have such costs certified by an independent accountant. Nevins Decl (Doc # 64), Exh 1 at 6. The complaint alleges that these safeguards are inadequate. Whether these safeguards are in fact adequate is a factual question to be resolved on summary judgment (assuming no material disputed issues) or at trial, but not at the pleading stage where the complaint's allegations must be accepted.

Hearst's reliance on the Ninth Circuit's opinion in *Lucas Automotive* is likewise unhelpful. In that case, a company acquired the exclusive right to distribute vintage tires for classic or antique cars, thereby excluding the plaintiff from "effective, meaningful participation in the market at the distribution level." *Lucas Automotive*, 140 F.3d at 1232 n. 17. Relying on *Brunswick*, the Ninth Circuit stated that the plaintiff "would have suffered the same injury had a small business acquired the exclusive right to manufacture and to distribute [the] tires," and thus the plaintiff could not demonstrate antitrust injury. *Id.* In the case at bar, to the contrary, the injuries FPP alleges would not have occurred had the March 16 agreement not have included its incentives for the Fang defendants to engage in predatory conduct in commercial printing.

In sum, the Supreme Court has provided that in order to plead antitrust injury sufficiently, "[t]he injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick*, 429 U.S. at 489, 97 S.Ct. 690. The injuries alleged by FPP in the FAC satisfy this requirement. Specifically, such injuries properly reflect the anticompetitive effect of a division or allocation of markets that enables the Fang defendants to engage in predatory conduct. Given the facts in the FAC, the court concludes that the FAC sufficiently alleges an antitrust injury to withstand dismissal.

B

FPP alleges that the underlying unlawful goal of Hearst and the Fang defendants' conspiracy is to enable the Fang defendants to allocate their respective printing and distribution resources to commercial printing in return for the aid in getting Hearst's acquisition of the Chronicle newspaper past political and regulatory hurdles, which included setting up the new Examiner as a "sham" competitor of Hearst's Chronicle. Seizing upon the FAC's allegations of predatory conduct, Hearst contends in its second argument that "FPP has alleged no facts whatsoever to suggest that it can meet its inescapable burden of proving the element of recoupment," and thus the claims against Hearst must be dismissed. DefBr (Doc # 63) at 13. This second argument, however, is based on antitrust concepts that are irrelevant to FPP's case against Hearst.

FPP's two federal claims against Hearst are based on section 1 of the Sherman Act and section 7 of the Clayton Act. FAC (Doc # 55), ¶¶ 74–79, 90–95. As Hearst recognizes in its motion, the section 2 claim is only asserted against the Fang defendants. Thus, Hearst's arguments re-

lated to predatory pricing unnecessarily confuse the elements of sections 1 and 2 of the Sherman Act.

■■■■ "To establish a section 1 violation under the Sherman Act, a plaintiff must demonstrate three elements: (1) an agreement, conspiracy, or combination among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged (i.e., 'antitrust injury')." *McGlinchy v. Shell Chemical Co.,* 845 F.2d 802, 811 (1988) (citations omitted); see also 15 USC § 1. Importantly, section 1 claims do not require the plaintiff to demonstrate the section 2 elements of "predatory or anticompetitive conduct" and a "dangerous probability of achieving 'monopoly power.'" *See D & S Redi–Mix v. Sierra Redi–Mix & Contracting Co.,* 692 F.2d 1245, 1247–49 (9th Cir.1982); see generally *Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1432–33 (9th Cir. 1995). It is the necessity of establishing these elements in a section 2 case that require the plaintiff to plead and prove the defendant's market power and the existence of significant barriers to entry. See *Rebel Oil,* 51 F.3d at 1434. All of the cases cited by Hearst in support of its recoupment argument (at least the portions of such cases addressing recoupment) involved section 2 monopoly or attempted monopoly claims or price discrimination claims under the Robinson–Patman Act. See *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 221–27, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) (price discrimination); *Rebel Oil Co., Inc. v. Atlantic Richfield Co.,* 146 F.3d 1088, 1091–98 (9th Cir.1998) (price discrimination); *Los Angeles Land Co. v. Brunswick Corp.,* 6 F.3d 1422, 1425–28 (9th Cir.1993) (monopoly); *Dial A Car, Inc. v. Transportation, Inc.,* 82 F.3d 484, 486–88 (D.C.Cir.

1996) (attempted monopoly); *Hennessy Industries Inc. v. FMC Corp.,* 779 F.2d 402, 405 (7th Cir.1985) (attempted monopoly); *Western Parcel Express v. United Parcel Service,* 65 F.Supp.2d 1052, 1062 (N.D.Cal.1998) (monopoly); *Wojcieszek v. New England Telephone and Telegraph Co.,* 977 F.Supp. 527, 533 (D.Mass.1997) (monopoly); *Valet Apartment Services, Inc. v. The Atlanta Journal and Constitution,* 865 F.Supp. 828, 832 (N.D.Ga.1994) (attempted monopoly). Horizontal market allocation schemes of the type alleged here can be challenged under sections 1 and 3 of the Sherman Act or section 5 of the Federal Trade Commission Act, 15 USC § 45. FPP has chosen section 1. "Predatory pricing is analyzed under the antitrust laws as illegal monopolization or attempt to monopolize under § 2 of the Sherman Act, or sometimes as a violation of § 2 of the Clayton Act, as amended by the Robinson–Patman Act." Hovenkamp, *Federal Antitrust Policy* § 8.1 at 298 (1994). The Supreme Court has noted that "primary-line competitive injury under the Robinson–Patman Act is of the same general character as the injury inflicted by predatory pricing schemes actionable under § 2 of the Sherman Act." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 221, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993).

The fortunes of predatory pricing claims have waned during the past quarter century. See Hovenkamp at 298–99. This is the development that Hearst's cases reflect. The climate for such predation theories may nonetheless be much warmer in the Ninth Circuit than elsewhere. See *D & S Redi–Mix,* 692 F.2d 1245; *William Inglis, Etc v. ITT Continental Baking Co.,* 668 F.2d 1014 (9th Cir.1981). Indeed, *D & S Redi–Mix's* facts rather strikingly parallel those in the present case. In that case, the court appears to have analyzed those facts under both sections 1 and 2 of the

Sherman Act. *D & S Redi–Mix*, 692 F.2d at 1247. But elements crucial in monopoly and price discrimination claims are not required for a claim under section 1. Indeed, so long as FPP can establish that injury to competition has occurred (as discussed in the previous section), FPP need not prove that the underlying objective of the alleged conspiracy between Hearst and the Fang defendants is likely to succeed through ultimate recoupment of Hearst's $66 million subsidy or the Fang defendants' losses (if any). In short, many of Hearst's authorities are beside the point of the claims at bar.

With this in mind, the court finds that FPP has clearly pled factual allegations that support each of the elements of a section 1 claim against Hearst. First, the FAC extensively describes the agreement between Hearst and the Fang defendants, formalized in the "Asset Purchase Agreement" on March 16, 2000. FAC (Doc # 55), ¶¶ 31–39. Second, the FAC details how the parties formed this agreement in order to "restrain trade in the market for the printing of independent publications and periodicals in the San Francisco area ***." *Id.*, ¶ 75. In support of this theory, FPP alleges that the parties established a deal that "fails to incorporate safeguards adequate to insure that the funds claimed under the Hearst subsidy are spent only on publishing the Examiner." *Id.*, ¶ 43. As a result, FPP asserts, the Fang defendants have already started to utilize the subsidy to fund their anticompetitive activities in pursuit of a monopoly. *Id.*, ¶¶ 47–50, 60–63. Finally, FPP alleges that competition has been injured because the parties to the agreement knew that this structure provided the Fang defendants "with the capability and incentive to use the assets (including the subsidy) transferred thereunder *** to pursue a plan to monopolize the San Francisco area market for printing independent publications and periodicals," *Id.*, ¶¶ 43, 47, and insulates Hearst from effective newspaper competition from the Fang defendants by ensuring that "the new Examiner would not be operated in competition with the Chronicle, thus ensuring that Hearst, as publisher of the only remaining San Francisco newspaper, would enjoy *** its own metropolitan newspaper/advertising monopoly." *Id.*, ¶ 46.

In short, the court finds that FPP has sufficiently pled facts in accordance with the low threshold of FRCP 8 that outline a section 1 claim under the Sherman Act. Hearst's argument based on the element of recoupment, therefore, is unavailing at this point.

C

■ Hearst's final argument is fairly simple, but also unsuccessful. Hearst argues that no plausible reason exists for Hearst to have the required "conscious commitment" to conspire with the Fang defendants for the latter to achieve a monopoly in the commercial printing market. DefBr (Doc # 63) at 17–20. In support of this contention, Hearst puts forth a couple of irrelevant and unpersuasive assertions.

First, Hearst asserts that no direct evidence exists showing that Hearst and the Fang defendants entered into an illegal conspiracy. That may be true, but as FPP correctly points out, an antitrust plaintiff may present either "direct or circumstantial evidence that reasonably tends to prove that the [conspiring parties] 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). In this regard, FPP has adequately pled a theory that, if demonstrated at trial, would provide circumstantial evidence of a conscious commitment to a common scheme de-

signed to achieve an unlawful objective. Specifically, the FAC states:

> Hearst entered into and benefits from the Examiner Deal because, in exchange for helping the Fang Defendants establish a local printing monopoly, Hearst received the political support needed to secure regulatory approval of the Chronicle sale to Hearst, as well as assurances that the new Examiner would not be operated in competition with the Chronicle, thus ensuring that Hearst, as publisher of then only remaining San Francisco metropolitan newspaper, would enjoy a San Francisco Bay Area [sic] newspaper monopoly. Thus, Hearst has agreed to give the Fang defendants a local newspaper/commercial printing monopoly in order to secure its own metropolitan newspaper/advertising monopoly.

FAC (Doc # 55), ¶ 46. In short, the FAC alleges that Hearst and the Fang defendants conspired for mutually beneficial reasons. Such reasons, if true, would be circumstantial evidence of a conscious commitment to conspire.

This brings the court to Hearst's other primary assertion, namely, that the relevant market at issue must include all competitors "who have the actual or potential ability to deprive each other of significant levels of business." *High Technology Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir.1993). Hearst appears to be trying to imply that a section 1 conspiracy to restrain trade unreasonably must involve competitors from the same market. But, as with its recoupment argument, Hearst cites cases in this regard that are not section 1 cases. See *id.* at 990 (involving monopoly claims for which a determination of the relevant market is necessary in order to analyze the market power of the purported monopolist); *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1053–54 (8th Cir.1999) (involving a challenge to a merger for which the relevant market

must be determined in order to evaluate the effect of the merger on competition).

Hearst has tellingly failed to point to a section 1 case requiring that each of the conspirators compete in the same market. As previously noted, section 1 of the Sherman Act prohibits an agreement in restraint of trade "among two or more persons ***." *McGlinchy*, 845 F.2d at 811. The statute itself simply states that "[e]very person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal ***" violates the law, without requiring that each of the parties to an agreement compete in the same market. 15 USC § 1. Indeed, tying arrangements, which historically have been condemned as per se illegal under section 1, involve two or more parties operating in distinct markets. See *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 461–62, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). In the case at bar, therefore, Hearst can be liable under section 1 for conspiring to influence a market other than the market in which it operates. As a result, Hearst's implied assertion to the contrary is simply incorrect.

For these reasons, Hearst's motion to dismiss the section 1 claim must fail. Although FPP's theory must be supported by evidence in order to prevail at trial, the court notes that a conspiracy to enable the Fang defendants to restrain trade in commercial printing has been pled adequately. Hearst's third and final argument, therefore, is likewise unavailing.

### D

FPP also alleges that Hearst and the Fang defendants have violated section 7 of the Clayton Act. With respect to Hearst specifically, FPP asserts that Hearst "caus[ed] the acquisition" of some of its assets by the Fang defendants, "the effect

of such acquisition which may be substantially to lessen competition, or tend to create a monopoly." FAC (Doc #55), ¶92.

In pertinent part, section 7 of the Clayton Act provides:

> No person engaged in commerce or in any activity affecting commerce *** and no person subject to the jurisdiction of the Federal Trade Commission shall *acquire* the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

15 USC § 18 (emphasis added). To the extent that Hearst's arguments previously discussed are asserted against FPP's section 7 claim, these arguments fail for the reasons they fail against the section 1 claim. Section 7 clearly prohibits any person from acquiring shares or assets of another company if such acquisition would substantially lessen competition or tend to create a monopoly. FPP plainly alleges that the March 16 agreement has the effect of lessening competition in both commercial printing and newspaper publishing.

Whether section 7 supports a claim for damages against the person or entity selling stock or assets, such as Hearst, however, may be open to question. To be certain, the Ninth Circuit has recognized that sellers may be joined in a section 7 action against a purchaser when the plaintiff seeks rescission or divestiture and the court needs jurisdiction over both the buying and selling company to fashion such equitable relief. *United States v. Coca-Cola Bottling Co. of Los Angeles,* 575 F.2d 222, 230–31 (9th Cir.1978). But in reaching that decision the appellate court mentioned in passing that section 7 does not cover claims against sellers for damages. *Id.* at 230 ("The fact that sellers in § 7 cases are not technical violators of the law is itself a strong equity consideration against rescission."). Moreover, other courts that have squarely addressed the issue have rejected section 7 claims for monetary damages against the seller of stock or assets. See *Dailey v. Quality School Plan, Inc.,* 380 F.2d 484, 488 (5th Cir.1967); *Arbitron Co. v. Tropicana Product Sales, Inc.,* 1993 WL 138965 at *4–7 (S.D.N.Y.); *Tim W. Koerner & Assocs., Inc. v. Aspen Labs, Inc.,* 492 F.Supp. 294, 300 (S.D.Tex.1980), aff'd, 683 F.2d 416 (5th Cir.1982). Accordingly, dismissal of the section 7 claim against Hearst, at least with respect to damages, may be appropriate.

But Hearst has not raised that argument. At the hearing on April 6, Hearst expressly declined to advance the contention. The court, therefore, does not address the issue and the section 7 claim against Hearst remains, at least for now, in the case.

### E

■ With respect to the two state law claims at issue, Hearst argues that they should be dismissed for the same reasons as the federal claims asserted against Hearst. As both parties point out, the court's analysis of FPP's state antitrust claims is informed by federal antitrust doctrine. See *Exxon Corp. v. Superior Court,* 51 Cal.App.4th 1672, 1680 n. 4, 60 Cal. Rptr.2d 195 (1997). Given the fact that the court has found Hearst's arguments with respect to FPP's federal claims to be unsuccessful, the state law claims against Hearst likewise survive.

### F

In summary, the court concludes that Hearst's three arguments in support of

**1186**

dismissal fail. Accordingly, Hearst's motion to dismiss (Doc # 63) is DENIED.

IT IS SO ORDERED.