**CHRISTOFFERSON DAIRY, INC., a Washington corporation, Plaintiff–Appellant,**

**v.**

**MMM SALES, INC., a California corporation; Darigold, Inc., a Washington corporation; Consolidated Dairy Products, Inc., a Washington corporation; Northwest Dairymen's Association, an agricultural corporation, Defendants–Appellees.**

**Nos. 87–3765, 87–3888.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 13, 1988.

Decided June 13, 1988.

John C. Guadnola, Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, Tacoma, Wash., for plaintiff-appellant.

Richard J. Wallis, Bogle & Gates, Seattle, Wash., for defendant-appellee MMM Sales, Inc.

James L. Magee, Graham & Dunn, Seattle, Wash., for defendants-appellees Darigold, Inc. and Northwest Dairymen's Ass'n.

Before TANG,[*] HALL and WIGGINS, Circuit Judges.

WIGGINS, Circuit Judge:

Christofferson Dairy brought suit under sections 1 and 2 of the Sherman Act against MMM Sales and its customer Darigold alleging a conspiracy to prevent Christofferson from purchasing California sur-

---

[*] Judge Tang was drawn to replace Judge Anderson. He has read the briefs, reviewed the record and listened to the tape of oral argument held on April 13, 1988.

plus milk. The district court granted summary judgment in favor of MMM and Darigold, finding that Christofferson did not present sufficient evidence of an intent to restrain competition, or of an actual injury to competition. We AFFIRM.

## I.

### FACTS AND PROCEEDINGS BELOW

Christofferson Dairy, Inc. operates a fluid milk bottling plant in Mt. Vernon, Washington. Christofferson purchases raw milk from suppliers and produces bottled Grade A milk and some other Grade A milk products.[1] Cache Foods, Inc. bought Christofferson in April, 1981. Cache ceased operating the dairy and leased the physical plant in December, 1982.

Appellee MMM Sales, Inc. is a California corporation that purchases raw milk from California producers and resells it to bottling plants and manufacturing facilities. MMM deals principally in Grade A milk and mainly sells to California customers.

Appellee Darigold is a Washington corporation that operates bottling and manufacturing plants in Washington and Oregon. Northwest Dairymen's Association (NDA) is an agricultural cooperative, owning virtually all of Darigold's stock. Consolidated Dairy Products, Inc. (CDP) is a Washington corporation, controlled by NDA.

During 1981 and 1982, high support prices resulted in a "milk surplus" in California. California milk producers asked MMM to attempt to arrange for the sale of their surplus milk. In 1981, MMM decided to try to sell to out-of-state customers. MMM sold milk for manufacturing pur-

poses to several companies in Washington and Oregon, including Darigold.

Later in 1981 and in 1982, MMM was approached by other out-of-state processors wishing to buy surplus milk for bottling. These included Klamath Falls Creamery, Echo Springs Dairy, and Umpqua Dairy, all located in Oregon, as well as Christofferson. Christofferson could purchase California surplus milk at a lower price than milk produced in Washington because the milk came into Washington on a episodic basis and therefore was not subject to federal price regulation. MMM claims it determined in 1981 that for business reasons, it was unable to ship milk for bottling purposes to out-of-state customers. MMM asserts three justifications for refusing to sell to Christofferson. First, MMM bought surplus milk from some producers that were not Grade A certified. Milk that does not meet California's Grade A standards cannot be used for bottling purposes in any state. Further, MMM was not sure that it could furnish Grade A milk on a reliable schedule. Second, MMM could not guarantee that the milk would be suitable for bottling by the time it reached out-of-state processors. Third, MMM did not wish to deal with state and federal regulatory requirements for the sale of milk out-of-state for bottling.[2] Christofferson claims, on the other hand, that MMM's refusal was the result of an agreement with Darigold not to sell to Christofferson or to other bottling plants in Washington and Oregon. Christofferson points to several conversations between employees of MMM and employees of Christofferson and of other bottling plants. MMM employees allegedly said they could not sell without checking with Darigold, and later that Darigold had given

---

1. The milk industry is highly regulated throughout the country. Only the highest quality milk, Grade A, can be used to produce bottled fluid milk. Other products, such as powdered milk and cheese, can be made either from Grade A or from manufacturing grade (Grade B) milk.

2. Under California law, milk sold for bottling is subject to much more extensive regulation than milk sold for manufacturing purposes only. *See* Cal.Food & Agric.Code §§ 35781–36123 (West 1986). For example, under § 35788, it is unlawful to sell Grade A milk except under the

supervision of an approved milk inspection service. By regulation, each tank shipped for bottling must be Grade A at the time it leaves the farm and must be inspected and certified for interstate shipment prior to leaving California.

Also, milk produced in California sold to a bottling plant under one of the federal orders is subject to federal regulation. During 1981 and 1982, Christofferson Dairy was subject to the Puget Sound–Inland Marketing Order, 7 C.F.R. §§ 1125.5–1125.88. These regulations contain recordkeeping and audit requirements.

MMM a list of companies to which it was not to sell bulk milk.

In 1982, Christofferson complained of MMM's actions to the Federal Trade Commission. The FTC investigated but did not bring any charges.

Cache Foods, Inc., as the sole stockholder of Christofferson, filed suit against MMM, Darigold, NDA, and CDP in September, 1985, alleging that the defendants had conspired in violation of sections 1 and 2 of the Sherman Act, and various state statutes.[3] In November, 1986, defendants moved for summary judgment on the merits. Discovery continued throughout the briefing and consideration of the motion.

Cache decided in January, 1987, only to pursue claims arising from Christofferson's alleged overpayment for raw milk. Defendants moved for summary judgment based on Cache's lack of standing. Cache then moved for leave to amend the complaint pursuant to Fed.R.Civ.P. 17(a) to substitute Christofferson as plaintiff. The district court granted the motion on March 2, 1987, noting that Cache's failure to name Christofferson as plaintiff was not an understandable mistake, but that defendants would not be prejudiced by the substitution, and that the defendants had not promptly raised the objection. The district court also found that Cache's motion unreasonably multiplied the cost of proceedings and therefore ordered Cache and/or Christofferson to pay defendants' costs and attorney's fees incurred in responding to the motion for substitution.

On March 6, 1987, the district court granted defendants' motion for summary judgment on the merits and entered an order dismissing all claims on March 10. The court found that the conspiracy did not make "economic sense" as to MMM and that defendants had presented "competing inferences" of independent action. Therefore, the court concluded that Christofferson had failed to make out a "reasonable inference" of a conspiracy. The court de-

nied Christofferson's motion for reconsideration on May 1, 1987. In an order reaffirming summary judgment, the court concluded that there were disputed facts regarding the existence of the conspiracy but that Christofferson's showing of intent to restrain competition and of actual injury to competition was not sufficient to withstand summary judgment. This appeal followed.

## II.

### STANDARD OF REVIEW

■ This court reviews a grant of summary judgment *de novo. California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). The court must determine, viewing the evidence in the light most favorable to Christofferson, whether there are genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Ashton v. Cory,* 780 F.2d 816, 818 (9th Cir.1986). Although summary judgment generally is disfavored in antitrust litigation, it is appropriate when the nonmoving party does not show any issues of material fact and does not present an adequate record to support a finding in his favor. *Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1477 (9th Cir.1986). Attorney's fees awards are generally reviewed for an abuse of discretion. *Beaudry Motor Co. v. ABKO Properties, Inc.,* 780 F.2d 751, 756 (9th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 100, 93 L.Ed.2d 51 (1986).

## III.

### ANALYSIS

A. *Section 1 Claims*

Section 1 of the Sherman Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States...." 15 U.S.C.

---

**3.** Specifically, Cache alleged: 1) a conspiracy to restrain trade in violation of section 1, 2) monopolization in violation of section 2, 3) a combination or conspiracy to monopolize, 4) attempted monopolization, and 5) violations of

the Unfair Business Practices–Consumer Protection Act (Wash.Rev.Code §§ 19.86.020 (unfair competition), 19.86.030 (combinations in restraint of trade), 19.86.040 (monopolization) (1978)).

§ 1. To maintain a successful section 1 action, Christofferson must show: 1) a contract, combination, or conspiracy, 2) that the agreement unreasonably restrained trade, and 3) that the restraint affected interstate commerce. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 632–33 (9th Cir.1987). Even if the evidence is sufficient to establish a conspiracy in violation of the antitrust laws, Christofferson cannot prevail unless it also shows that it suffered an injury resulting from the illegal conduct. *Richards v. Neilsen Freight Lines,* 810 F.2d 898, 902 (9th Cir.1987). We assume without deciding that Christofferson has met its burden under *T.W. Elec. Serv.* of presenting sufficient evidence of a conspiracy.[4] Christofferson has not, however, adequately shown that the agreement unreasonably restrained trade or that Christofferson suffered an injury resulting from the allegedly illegal conduct.

An essential element of a section 1 claim is that the agreement unreasonably restrained trade. *T.W. Elec. Serv.,* 809 F.2d at 632–33. The alleged agreement here was between a supplier and customer. Vertical arrangements are almost always judged by the rule of reason. *Cascade Cabinet Co. v. Western Cabinet & Millwork, Inc.,* 710 F.2d 1366, 1371 (9th Cir. 1983); *Gough v. Rossmoor Corp.,* 585 F.2d 381, 387 (9th Cir.1978), *cert. denied,* 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979).[5] Under the rule of reason approach, the plaintiff must show an injury to *competition,* rather than just an injury to plaintiff's business. *See Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Systems, Inc.,* 732 F.2d 1403, 1408 (9th Cir. 1984). "The conduct must have an adverse impact on the competitive conditions in general as they exist within the field of commerce in which the plaintiff is engaged." *Gough,* 585 F.2d at 386.

In reaffirming summary judgment, the district court found that Christofferson's showing of an intent to harm competition and of an actual injury to competition were inadequate. Christofferson asserts two objections to this ruling: 1) the district court improperly considered these issues because they were not raised in the briefs, and 2) even if properly considered, the record contains substantial evidence of an impact on competition and of an injury to Christofferson. Although MMM's and Darigold's motions for summary judgment focused upon the lack of evidence of an agreement, several references in MMM's papers adequately put the issue of harm to competition before the district court. In MMM's reply memorandum in support of summary judgment, MMM addressed the economic ramifications of an exclusive dealing arrangement. MMM stated that the

---

**4.** This court has described the nature and allocation of the evidentiary burdens in the context of a summary judgment motion by the defendant in a Sherman Act, section 1 case. The moving party has the initial burden of identifying the portions of the file showing the absence of a genuine issue of fact. *T.W. Elec. Serv.,* 809 F.2d at 632. If there is no direct evidence of a conspiracy, this burden is satisfied by the defendants offering a "plausible and justifiable" explanation of their conduct that rebuts the allegation of a conspiracy. *Id.* The burden then shifts to the plaintiff to present "specific facts" capable of sustaining a rational inference of conspiracy and tending to exclude the possibility that the defendants acted independently. *Id.* If the plaintiff's claim makes no economic sense, the plaintiff has a heavier burden of presenting persuasive evidence of a conspiracy. *Richards,* 810 F.2d at 902 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

**5.** The only types of vertical restraints that the Supreme Court has held *per se* unreasonable are vertical price fixing and tie-in sales. *Gough,* 585 F.2d at 386. The conduct here clearly does not fit into either of these categories. We have, however, carved out a limited exception to the rule that vertical concert of activity is not per se unreasonable. The per se rule applies when the particular restraint has such a " 'pernicious effect on competition and [is so lacking] of any redeeming virtue.' " *Cascade Cabinet,* 710 F.2d at 1371 (quoting *Northern Pac. Ry. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)). We look at whether the " 'practice facially appears to be one that would always or almost always tend to restrict competition and decrease output.' " *Cascade Cabinet,* 710 F.2d at 1371 (quoting *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979)). Plaintiffs do not argue that a per se rule should apply here and therefore we judge the restraint by the rule of reason.

alleged agreement at issue here was legal because "the volume of milk covered by the alleged output contract was *de minimus* relative to the volume of milk sold in the market alleged in plaintiff's compliant [sic], and [because] the alleged agreement is only of short duration, an insubstantial share of the relevant market would have been foreclosed." Again, in responding to Christofferson's supplemental submission in opposition to summary judgment, MMM pointed out that Clyde McCaughey, president of Cache and Christofferson, had made no effort to obtain California surplus milk from any other supplier. MMM further asserted that "MMM sales did not control the surplus milk available in California" and that there were "numerous other sources of supply for California surplus milk." Finally, in response to Christofferson's motion for reconsideration, MMM reiterated that alternative sources were available. MMM specifically urged this as a basis for summary judgment: "Because plaintiff had alternative sources of supply, summary judgment was and is appropriate." Christofferson filed a reply to MMM's response, and thus had an opportunity to address the alternative sources argument. We conclude, therefore, that the issue was properly raised in the district court.

■ Christofferson contends that the alleged conspiracy restrained competition in two ways. First, it eliminated pressure on Washington milk producers to lower raw milk prices. Second, it increased Christofferson's costs and thus its resale prices, for bottled fluid milk. These effects could *only* have occurred, however, if MMM was the only source or at least a source with substantial market power of low-cost surplus milk accessible to Christofferson. Even if MMM refused to sell to Christofferson, if other sources of low-cost surplus milk were available, Washington producers would have an incentive to lower prices. Also, Christofferson could have kept its costs down by buying from these other California producers. *Cf. Cascade Cabinet*, 710 F.2d at 1372 (cabinet manufacturers' actions to prevent another manufacturer from leasing abandoned premises to Cas-

cade did not adversely affect competition when Cascade did not allege that it was unable to obtain other commercial space or that cabinet manufacturer had market power in real estate market).

Christofferson has not presented any evidence that MMM controlled the surplus milk supply in California. MMM presented the testimony of Michael Nash, general manager of California Co-op Creamery, that other producers in California had surplus milk. He named California Co-op, Knudsen, Foremost, and DCCA. Albert Nunez, president of AC Trucking, also testified that there were "plenty" of other sources for surplus milk. Christofferson did not present any contradictory evidence. Moreover, Christofferson has not shown that it pursued any of these alternative sources. When asked at his deposition whether he had made any efforts to obtain surplus milk from states other than Washington and Idaho, McCaughey responded: "I don't remember of any." Specifically, he testified that he had not tried to obtain surplus milk from Knudsen, Crystal Creamery, California Co-op, DCCA, or CMP. Similarly, Haxby, manager of Christofferson, testified that he had not tried to contact Foremost, Knudsen, DCCA, CMP, or Carnation. Christofferson only points to one piece of evidence to suggest it made reasonable efforts to obtain surplus milk from sources other than MMM. In his deposition, McCaughey stated:

> I don't know if I talked about surplus milk in California. I said, "Let's try to contact—if there's surplus milk out there, let's try and get some of it," but I don't remember if—it wouldn't have been just California. We were just trying to get some surplus milk.

This statement suggests only that Christofferson wanted to purchase surplus milk, not that it tried and was unable to purchase milk from producers other than MMM.

Christofferson thus failed to present sufficient evidence that the alleged agreement between MMM and Darigold unreasonably restrained competition. Christofferson did not show that MMM was the only, or even

the controlling source of surplus milk, or that Christofferson pursued other sources. Accordingly, the district court properly granted summary judgment for MMM and Darigold on this ground.

A section 1 claim also requires a showing of an injury resulting from the illegal conduct. *Richards*, 810 F.2d at 902. For the reasons discussed above, Christofferson cannot show antitrust injury. Other sources of surplus milk were available and Christofferson did not pursue these sources. It cannot, therefore, claim that it suffered injury in the form of overpayments resulting from denial of access to low-cost milk.

## B. *Section 2 Claims*

Section 2 of the Sherman Act provides in part: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire ... to monopolize any part of the trade or commerce among the several States ... shall be deemed guilty of a felony...." 15 U.S.C. § 2. Christofferson alleged the following section 2 violations in its complaint: monopolization, a combination or conspiracy to monopolize, and attempted monopolization. These claims are all premised on monopoly power held or sought by Darigold, NDA and CDP.

### 1. *Monopolization*

■ The elements of a monopolization offense are: monopoly power, the willful acquisition or maintenance of that power, and causal antitrust injury. *Drinkwine v. Federated Publications, Inc.*, 780 F.2d 735, 738–39 (9th Cir.1985), *cert. denied*, 475 U.S. 1087, 106 S.Ct. 1471, 89 L.Ed.2d 727 (1986). We do not address the relevant market and the extent of Darigold and NDA's market power because Christofferson's claim fails on the next two elements.

■ The test of willful maintenance or acquisition of monopoly power is whether the acts complained of unreasonably restricted competition. *Id.* at 739. As discussed above, Christofferson has failed to

make such a showing because of the availability of alternative surplus milk sources. For the same reason, Christofferson has failed to show antitrust injury.

### 2. *Attempted Monopolization and Conspiracy to Monopolize*

■ To establish a claim for attempted monopolization, the plaintiff must show: 1) a specific intent to monopolize the market, 2) that the defendant committed acts designed to achieve the illegal objective, and 3) a dangerous probability of success. *De Modena v. Kaiser Found. Health Plan, Inc.*, 743 F.2d 1388, 1395 (9th Cir.1984), *cert. denied*, 469 U.S. 1229, 105 S.Ct. 1230, 84 L.Ed.2d 368 (1985). A conspiracy to monopolize claim similarly focuses on specific intent to monopolize and anticompetitive acts designed to effect that intent. The requisite act, in a conspiracy claim, may be the agreement itself. *Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir.1980), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981).

■ Christofferson has failed to show that Darigold had a specific intent to monopolize. Looking at the facts most favorably to Christofferson, Darigold may have intended to prevent Christofferson from buying low-cost milk from MMM. This intent, however, falls short of an intent to monopolize because Christofferson had access to other suppliers and was not prevented from competing. *Cf. Cascade Cabinet*, 710 F.2d at 1374 (single act of excluding Cascade from leasing abandoned facilities did not prevent Cascade from entering the market).

Proof of specific intent may sometimes be supplied by inference from certain types of conduct. The conduct must, however, amount to an unreasonable restraint of trade under Sherman Act, section 1 standards. *Id.; Gough*, 585 F.2d at 390. Christofferson has failed to make such a showing.[6]

---

**6.** Because Christofferson has clearly failed to show specific intent, we need not address whether the alleged agreement was an act de-

signed to achieve monopoly power or whether there was a dangerous probability of success.

Christofferson has thus failed to present sufficient evidence to withstand summary judgment on its section 2 claims. Christofferson has not shown the willful acquisition of monopoly power element of its monopolization claim or the specific intent to monopolize required for its conspiracy and attempt claims.

### C. *State Law Claims*

Christofferson also alleged violations of the Washington antitrust laws, Wash.Rev. Code §§ 19.86.020, 19.86.030, 19.86.040 (1976). Christofferson did not argue below or on appeal that the state claims had any merit apart from the federal claims. Summary judgment was therefore properly granted as to the state claims.

### D. *Attorneys' Fees*

■ Christofferson also appeals the district court's award of $900 to MMM and $694 to Darigold for attorneys' fees incurred in defending Cache's motion to amend its complaint to substitute Christofferson as plaintiff. The district court found that Christofferson had unreasonably multiplied the costs of the proceedings by substituting plaintiffs only five weeks before trial. Therefore, the court found that costs and fees were justified under Local Rule GR 3(d).[7] Christofferson argues that the court abused its discretion because the fact that the court granted the motion demonstrates that it was not unreasonable or vexatious. Although the motion to substitute was not itself unreasonable, the *timing* of the motion was. The plaintiff admitted it knew of the respective interests of Cache and Christofferson and

the types of damages involved at the time of filing the complaint. The delay in substituting Christofferson as plaintiff caused defendants to file unnecessary discovery motions and a motion for summary judgment based on lack of standing. Under these circumstances, the district court did not abuse its discretion.

### IV.

### CONCLUSION

On its Sherman Act section 1 claims, Christofferson has failed to show an unreasonable restraint on competition or antitrust injury because Christofferson did not pursue alternative sources of surplus milk.

Christofferson has also failed to present sufficient evidence of a genuine issue of fact on its section 2 claims. Christofferson has not shown a willful acquisition of monopoly power or a specific intent to monopolize. Therefore, we AFFIRM the grant of summary judgment in favor of MMM and Darigold.

We also AFFIRM the award of attorney's fees to defendants for defending the dilatory motion to substitute plaintiffs.

AFFIRMED.

---

7. The rule provides in part:

> An attorney ... who presents to the Court unnecessary motions or unwarranted opposition to motions, or otherwise so multiplies the proceedings in a case as to increase the cost unreasonably and vexatiously, may ... be required by the Court to satisfy personally such excess costs....

Local rule, Western District of Washington, GR 3(d).