**SICOR LIMITED; Alco Chemicals, Ltd., Plaintiffs–Counter–Defendants–Appellants,**

and

**Sicor S.p.A., Counter–Defendant,**

v.

**CETUS CORPORATION; Cetus Generic Corporation; Ben Venue Laboratories, Inc.; Ben Venue Generic Corporation; and Erbamont N.V., Defendants–Appellees,**

and

**Cetus–Ben Venue Therapeutics; Erbamont, Inc.; and Farmitalia Carlo Erba, S.r.l., Defendants–Counter–Claimants–Appellees.**

**No. 93–15667.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 12, 1994.

Decided April 3, 1995.

---

Douglas V. Rigler, Whitman & Ransom, Washington, DC, and Josef D. Cooper, Cooper & Kirkham, San Francisco, CA, for plaintiffs-counter-defendants-appellants.

Charles B. Cohler, Lasky, Haas, Cohler & Munter, San Francisco, CA, for defendants-counter-claimants-appellees.

Before: CHOY, LEAVY, and KLEINFELD, Circuit Judges.

LEAVY, Circuit Judge:

Two foreign corporations filed the instant action in federal district court against several foreign and domestic companies, asserting federal antitrust claims and state law causes of action for breach of contract, interference with contractual relations, and indebitatus assumpsit. The district court entered summary judgment in favor of the defendants on all claims, and the plaintiffs have appealed. We affirm in part, reverse in part, and remand.

## FACTS AND PRIOR PROCEEDINGS

Doxorubicin hydrochloride ("doxorubicin") is a chemical used in the treatment of some fourteen different types of cancer. Although it is one of the most effective and widely sold anti-cancer drugs available in the United States, it is also highly toxic in bulk form and must be specially prepared and packaged, or "finished," before it can be marketed in dosage form. Consequently, a distributor of

bulk doxorubicin must obtain approval from the *Food and Drug Administration* ("FDA") of the distributor's source (i.e., the manufacturer of the bulk doxorubicin) before turning it over to a finisher.

Erbamont N.V., a Netherlands Antilles company, once enjoyed a virtual monopoly on the sale of doxorubicin in the United States through its Italian subsidiary, Farmitalia Carlo Erba, S.r.l. ("Farmitalia"). Farmitalia, which had developed the techniques necessary to produce doxorubicin in commercial quantities, held an American patent on the drug's production until June 1988, as well as related patents on certain other production techniques until April 1991. Farmitalia marketed doxorubicin in the United States under the label Adriamycin exclusively through Erbamont N.V.'s wholly owned American subsidiary, Erbamont, Inc., and its Adria division (collectively, "Erbamont").

Shortly before the expiration of Farmitalia's product patent, another Italian firm, Sicor S.p.A., decided to enter the American market by manufacturing generic doxorubicin under an arrangement with its wholly owned United Kingdom subsidiary, Sicor Limited, which owned the microorganism from which doxorubicin is produced. As neither Sicor S.p.A. nor Sicor Limited (jointly, "Sicor") had an American presence or sales network, Sicor entered into a distribution agreement with Alco Chemicals, Ltd. ("Alco"), a U.K. corporation, and a finishing agreement with Cetus–Ben Venue Therapeutics ("CBVT"),[1] a California partnership, in late 1987.

On February 1, 1988, Alco and CBVT executed a distribution agreement, dated as of November 5, 1987 ("Distribution Agreement"), in which Alco appointed CBVT to act as its exclusive American distributor of Sicor-manufactured doxorubicin to be finished by CBVT under the provisions of Sicor's contract with CBVT ("Supply Agreement"). In exchange for this exclusive arrangement, CBVT was to pay Alco $1,000,000 and distribution fees equal to 50% of CBVT's revenues from the sale of finished doxorubicin, net of CBVT's expenses in buying bulk doxorubicin under the Supply Agreement and various taxes, rebates, and other charges.

Farmitalia and Erbamont ("Farmitalia Group") responded immediately to this challenge to their dominant position in the United States market. In 1988, Erbamont unsuccessfully sought an injunction from the United States International Trade Commission ("ITC") against CBVT's importation of SICOR-manufactured doxorubicin on the ground of patent infringement. Shortly thereafter, CBVT filed an antitrust and unfair competition action against the Farmitalia Group in federal district court.

Meanwhile, Alco and CBVT amended the Distribution Agreement on April 10, 1989 ("First Amendment"). Among other things, the First Amendment modified the terms governing CBVT's payment of distribution fees to Alco and established a reimbursement account to fund CBVT's pursuit of antitrust claims against the Farmitalia Group. That same day, Sicor and CBVT entered into a superseding agreement, retroactively dated November 5, 1987 ("Second Supply Agreement"), separating Sicor's supply obligations from Alco's distribution commitments under the Distribution Agreement.[2] By letter agreement dated October 8, 1990 ("Second Amendment"), Alco and CBVT further amended the Distribution Agreement to permit CBVT to deduct from distribution fees owed to Alco 50% of CBVT's costs in pursu-

---

**1.** CBVT was formed by two general partners, Cetus Generic Corporation ("CGC") and Ben Venue Generic Corporation ("BVGC"). CGC, a Delaware corporation with its principal place of business in California, was a subsidiary of Cetus Corporation, which also was a Delaware corporation based in California. BVGC, an Ohio corporation, is a subsidiary of Ben Venue Laboratories, Inc., a Pennsylvania corporation with its principal place of business in Ohio. In 1992, Cetus Corporation changed its name to Cetus Oncology Corporation following its acquisition by merger with Chiron Corporation. CGC remains a wholly owned subsidiary of Cetus Oncology Corporation.

**2.** Although Sicor alleges that the two parties also orally agreed that CBVT would pursue its antitrust and unfair competition claims against the Farmitalia Group in consideration for Alco's payment of one-half of the associated litigation costs, the parties dispute the existence and enforceability of any such agreement. *See infra.*

ing its legal claims against the Farmitalia Group.

On May 25, 1989, CBVT made its first American sale pursuant to the Second Supply Agreement, thereby starting the running of the contract's three-year term. Between June 1989 and September 1990, CBVT made substantial inroads into Erbamont's dominant position in the American doxorubicin market. By underpricing its main competitor on sales of doxorubicin in both powder and solution form, CBVT increased its market share from 0% to 30%. During this same time period, two smaller competitors held a combined market share of approximately 9%. Erbamont's market share declined correspondingly.

The Farmitalia Group did not ignore this competition. In addition to the failed ITC claim, Farmitalia initiated legal proceedings in Italy against Sicor, alleging theft of a proprietary microorganism essential to the production of doxorubicin. Although the action was eventually dismissed, Farmitalia obtained a temporary injunction against Sicor S.p.A.'s doxorubicin production facility in Milan on July 21, 1989. The plant remained closed until March 1990, when it reopened temporarily. On September 21, 1990, the plant was again shut down pursuant to an Italian court's sequestration decree. The plant has remained closed since then.

In response to the production halt at its plant in Italy, Sicor notified CBVT and sought to obtain supplies of bulk doxorubicin from other firms to meet its interim needs. On October 9, 1990, CBVT and Sicor met with Pharmachemie, B.V., a European distributor of Sicor-manufactured doxorubicin. Pharmachemie offered CBVT 2.4 kilograms of FDA-approved, Sicor-produced bulk doxorubicin. CBVT declined the offer, explaining that its inventory of Sicor-produced bulk doxorubicin would last until the following summer.

Meanwhile, Sicor and CBVT modified their supply arrangement by agreement dated October 8, 1990 ("Letter Agreement").[3] The Letter Agreement revised the pricing formula for CBVT's purchases of doxorubicin and extended from 60 to 180 days the payment period for Sicor's invoices to CBVT. In addition, the Letter Agreement required CBVT to remit to Sicor 50% of its proceeds, net of various discounts and rebates, from sales of doxorubicin in the United States. Also pursuant to the Letter Agreement, the parties confirmed and ratified the remainder of the Second Supply Agreement.

In the meantime, Sicor sought an alternate producer to perform its contractual supply obligations. This search led to Mercian Corporation ("Mercian"), a Japanese company with prior FDA approval as a producer of bulk doxorubicin and an ongoing relationship with Sicor. Before Mercian could fill CBVT's orders from Sicor, however, CBVT would be required to obtain FDA approval as a finisher of Mercian-manufactured bulk doxorubicin, an administrative process with an expected time length the parties dispute: CBVT contended that FDA approval would take up to eighteen months, while Sicor estimated no more than five months. Accordingly, in late 1990, Sicor and Mercian began negotiating an agreement allowing Mercian to supply bulk doxorubicin in Sicor's stead under the terms of the Second Supply Agreement.[4]

On January 25, 1991, Sicor shipped a 220–gram sample of Mercian-produced doxorubicin to CBVT to facilitate the latter's batch testing and preparation of an FDA application. Sicor expected CBVT to complete and file this application shortly after April 10, 1991, the expiration date of an adverse Farmitalia process patent. On February 22, 1991, CBVT outlined for Sicor various scenarios for launching sales of finished, Mercian-produced doxorubicin in the United States by as early as September 1991.

Meanwhile, CBVT was negotiating with the Farmitalia Group to settle its antitrust and patent suit against them and to secure an alternate source of bulk doxorubicin. CBVT disclosed these negotiations in a meeting with Sicor in March 1991. By letter received April 10, 1991, CBVT formally noti-

---

3. Not to be confused with Alco and CBVT's Second Amendment, also of that date. *See supra.*

4. The parties dispute whether these negotiations gave rise to a contract. *See infra.*

fied Sicor and Alco that CBVT and Erbamont had agreed to enter into an exclusive supply and distribution arrangement for Farmitalia-produced bulk doxorubicin, that CBVT had settled its litigation against the Farmitalia Group, and that CBVT would not be free to begin the bulk supply relationship contemplated by the parties.

On April 25, 1991, Sicor and Alco filed the instant action in federal district court against CBVT[5] and the Farmitalia Group, alleging breach of contract, tortious interference with contract, and unjust enrichment, as well as anticompetitive acts and monopolization of the American doxorubicin market in violation of federal law. On July 14, 1992, CBVT and the Farmitalia Group separately moved for summary judgment or, in the alternative, partial summary judgment on all claims. Following briefing and oral argument, the district court granted the motions for partial summary judgment on January 11, 1993, and entered final judgment pursuant to Fed. R.Civ.P. 54(b) two months later in favor of all defendants. Alco and Sicor have timely appealed.

## ANALYSIS

### I. *Federal Antitrust Claims*

#### A. Standard of Review[6]

We review de novo a district court's grant of summary judgment, applying the same standards as would the lower court. *Bassette v. Stone Container Corp.*, 25 F.3d 757, 759 (9th Cir.1994). In opposing a motion for summary judgment in an antitrust case, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts[,]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *i.e.*, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). Thus, while the moving party has the initial burden of establishing the absence of a genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), the nonmoving party must go beyond the pleadings and identify facts showing the existence of a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553.

#### B. Discussion[7]

Sicor and Alco ("appellants") contend that the district court overlooked genuine issues of material fact as to whether the Farmitalia Group and CBVT (collectively, "appellees") committed anticompetitive acts injurious to competition and to the appellants in violation of Sections 1 and 2 of the Sherman Antitrust Act, 26 Stat. 209, ch. 647, §§ 1, 2 (July 2, 1890), *codified at* 15 U.S.C. §§ 1, 2. Each of these arguments will be discussed in turn.

---

**5.** "CBVT" is here meant to include the Cetus Corporation, Cetus Generic Corporation, Ben Venue Laboratories, Inc., and Ben Venue Generic Corporation, as well as Cetus–Ben Venue Therapeutics. *See* note 1, *supra*.

**6.** While summary judgment has historically been disfavored in antitrust cases, *see High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 989 (9th Cir.1993) (citing *Christofferson Dairy, Inc. v. MMM Sales, Inc.*, 849 F.2d 1168, 1171 (9th Cir.1988)), this may no longer be so. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir.), *cert. denied*, 502 U.S. 994, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991). Regardless of whether or not summary judgment is still disfavored in antitrust cases, we conclude for the reasons set forth in Part I.B. that summary judgment was appropriate on the appellants' antitrust claims.

**7.** The appellants' initial contention is that the district court failed to distinguish properly between "specific facts" and "substantial evidence," and thereby applied an incorrect legal standard for summary judgment in an antitrust case. *See T.W. Elec. Serv. v. Pacific Elec. Contrs. Ass'n*, 809 F.2d 626, 632 (9th Cir.1987). Because the district court's grant of summary judgment was premised on its holding that there was no proof of any injury to competition, any error—if such it was—involving a confusion of "substantial evidence" with "specific facts" was clearly harmless.

### 1. The Section 1 Claim

■ Section 1 of the Sherman Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States[.] ..." 15 U.S.C. § 1. "[T]o establish a claim under § 1 of the Sherman Act, the plaintiff must show 1) that there was a contract, combination, or conspiracy; 2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and 3) that the restraint affected interstate commerce." *Bhan v. NME Hosps., Inc.,* 929 F.2d 1404, 1410 (9th Cir.) (citing *T.W. Elec. Serv. v. Pacific Elec. Contrs. Ass'n.,* 809 F.2d 626, 632–33 (9th Cir.1987)), *cert. denied,* 502 U.S. 994, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991). In addition, the appellants must show that they suffered an injury resulting from the illegal conduct. *See Christofferson Dairy, Inc. v. MMM Sales, Inc.,* 849 F.2d 1168, 1172 (9th Cir.1988). Taking these requirements in turn, and viewing the record in the light most favorable to the nonmoving parties, we conclude that the appellants failed to allege and show that the conduct complained of unreasonably restrained trade.

It is undisputed that the agreement between Erbamont and CBVT constituted a vertical arrangement between a supplier and a distributor of doxorubicin. "Vertical arrangements are almost always judged by the rule of reason. Under the rule of reason approach, the plaintiff must show an injury to *competition,* rather than just an injury to plaintiff's business." *Id.* (emphasis in original; citations omitted). Put somewhat differently,

> [T]he factual support needed to show injury to competition must include proof of the relevant geographic and product markets and demonstrations of the restraint's anticompetitive effects within those markets. Avoiding such market analysis requires proof of actual detrimental competitive effects such as output decreases or price increases.

*Les Shockley Racing, Inc. v. National Hot Rod Ass'n,* 884 F.2d 504, 508 (9th Cir.1989) (as amended; internal citations omitted).

The appellees contended below, and maintain on appeal, that the appellants did not meet their burden in opposing the motion for summary judgment because, *inter alia,* they failed to demonstrate an antitrust injury either to competition in general or to the appellants' business specifically. CBVT argued that the ability to market already finished doxorubicin produced by Erbamont would permit it to maintain customer goodwill and momentum while pursuing such approval. Agreeing with these contentions, the district court characterized CBVT's arrangement as being "pro-competitive," because (1) Erbamont's supply of doxorubicin enabled CBVT to remain in the market without any interruption in its business; (2) Sicor and Mercian remained free to try to sell their compound to other finisher-distributors in the United States; and (3) CBVT's arrangement with Erbamont had no apparent anticompetitive effect at the manufacturing level, and promoted (or at least did not discourage) competition downstream by preventing a reduction in the number of finisher-distributors in the American market.

We agree. As a preliminary matter, it is apparent that CBVT's arrangement with Erbamont enabled it to remain in the United States market and was thus procompetitive, notwithstanding Sicor's contention that CBVT did not lose that ability through any fault of Sicor's. Indeed, to hold as Sicor urges would result in a lessening of competition, since that would amount to a prohibition against CBVT's obtaining supplies of bulk doxorubicin elsewhere. Put another way, there was no harm to competition on account of the appellees' conduct, except for the Italian litigation which shut down Sicor's factory. Admittedly it hurt Farmitalia's would-be competitor, but Sicor had already been shut down by the Italian sequestration decree.

Moreover, it is apparent from the materials before us that valid business reasons existed for CBVT's action, *i.e.,* CBVT's reason for buying from Farmitalia was to obtain the product, and Farmitalia's reason for selling that product to CBVT was to make money. In the absence of a showing of selling at a loss or similar conduct explainable only by a motive to reduce or eliminate competition,

the appellants' claim is not persuasive.[8] *See High Tech. Careers v. San Jose Mercury News,* 996 F.2d 987, 990 (9th Cir.1993) ("If there is a valid business reason for [the defendant's] conduct, there is no antitrust liability.").

Finally, the "technological complexities" argument advanced by the appellants in support of their contention that they faced insurmountable entry barriers to the American doxorubicin market is unconvincing. Such things constitute costs, obviously, but they are not barriers to market entry; indeed, the only barrier faced by Sicor prior to June 1988 was Farmitalia's patent. While the burden of FDA regulations might arguably constitute a barrier under some circumstances, the five-month delay argued by Sicor hardly rises to such a level.[9]

As Justice Brandeis noted more than seventy-five years ago,

> Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or

whether it is such as may suppress or even destroy competition.

*Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). Accordingly, and in light of the above, we conclude that the district court did not err by granting summary judgment on the appellants' Section 1 claim.[10]

### 2. The Section 2 Claim

■ Under Section 2 of the Sherman Act, "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire ... to monopolize any part of the trade or commerce among the several States ... shall be deemed guilty of a felony[.] ..." 15 U.S.C. § 2. A Section 2 monopolization claim requires proof of three things: First, that the Farmitalia Group possessed monopoly power in the relevant market; second, that the Farmitalia Group acquired or maintained that power willfully, rather than " 'as a consequence of a superior product, business acumen or historical accident[,]' " *High Tech. Careers,* 996 F.2d at 989–90 (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)); and third, that the appellants suffered a causal antitrust injury.[11] *See Christofferson Dairy,* 849 F.2d at 1174.

---

8. While it is true as a general proposition that the existence of valid business reasons motivating a monopolist's conduct is ordinarily a question of fact, *see High Tech. Careers v. San Jose Mercury News,* 996 F.2d 987, 990 (9th Cir.1993), the absence of evidence to the contrary in the instant case is dispositive of this issue. *See also Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1356 ("conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy").

9. Sicor's allegation that no other finisher-distributor would have been readily available to contract with Sicor or other potential foreign entrants into the American market at the supply level is arguably beside the point, for elimination of Sicor as a competitor would still leave the market essentially where it was before Sicor's entry, *viz.,* with two producers and three finisher-distributors.

10. Because of our holding on this point, we need not reach the merits of the appellants' contention that the district court erred by ruling that Sicor, as a mere middleman, lacked standing to assert a claim under federal antitrust law. *But see Hanover Shoe, Inc. v. United Shoe Mach. Corp.,* 392 U.S. 481, 488–89, 88 S.Ct. 2224, 2228–29, 20

L.Ed.2d 1231 (1968) (rejecting defense in Clayton Act case that middleman, in being able to pass overcharge on to consumers, was not truly injured and thus lacked antitrust standing); *Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp.,* 951 F.2d 1158, 1161 (9th Cir.1991) (reversing denial of standing to advertising consultants earning commissions by serving as intermediary between advertisers and publishers), *cert. denied,* 504 U.S. 913, 112 S.Ct. 1947, 118 L.Ed.2d 552 (1992). With this said, however, we note that the district court did not base its holding on this conclusion, ruling instead that "the Court need not decide this issue because the Court GRANTS Erbamont's motion for partial summary judgment on the basis that there has been no proof of injury to competition."

11. A Section 2 claim of attempted monopolization, on the other hand, requires proof of four elements: "(1) specific intent to control prices or destroy competition; (2) predatory or anti-competitive conduct directed toward accomplishing that purpose; (3) a dangerous probability of success; and (4) causal antitrust injury." *McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 811 (9th Cir.1988). As there was no showing of attempted monopolization on the part of the appellees, we will not further discuss this aspect of Section 2.

In keeping with these requirements, the appellants averred in their complaint that the appellees had succeeded in monopolizing the American market for doxorubicin; that this success arose from concerted unlawful actions, including unlawful interference with contractual relations between Sicor and Mercian, CBVT's breach of its supply and distribution agreements with Sicor and Alco, and CBVT's settlement of its antitrust action against the Farmitalia Group; and that the appellants suffered injury as a result.

The district court granted summary judgment on the Section 2 claim for essentially the same reasons it rejected the appellants' Section 1 claim. Accordingly, affirmance is appropriate here as well. *See Williams v. I.B. Fischer Nevada,* 999 F.2d 445, 448 (9th Cir.1993) (per curiam) (if conduct alleged in support of Section 1 claim is not deemed anticompetitive, same conduct alleged in support of Section 2 claim must also fail).

## II. *State Law Claims*

### A. Standard of Review

■ "Under California law, extrinsic evidence is admissible if relevant to prove a meaning to which the contractual language is reasonably susceptible." *Tamen v. Alhambra World Inv., Inc. (In re Tamen),* 22 F.3d 199, 203 (9th Cir.1994) (interpreting California law).[12] Where there is a dispute over a material fact deemed necessary to a contract's interpretation, based on evidentiary support for competing interpretations, summary judgment is inappropriate. *National Union Fire Ins. Co. v. Argonaut Ins. Co.,*

701 F.2d 95, 97 (9th Cir.1983) (applying California law).

### B. Discussion

#### 1. Second Supply Agreement

■ Sicor argues that CBVT breached the Second Supply Agreement by unilaterally terminating the contract without cause, notice, or providing an opportunity to cure. The district court rejected these contentions, based on its conclusion that no triable issue of fact existed on the question of a breach of the contract because the Second Supply Agreement required Sicor to supply doxorubicin to CBVT that had been manufactured exclusively by Sicor S.p.A. We disagree.

#### a. Cause for Termination

While the Second Supply Agreement specifies that Sicor is to be the exclusive *seller* of bulk doxorubicin to be purchased and finished by CBVT in the United States, the contract is ambiguous as to whether or not Sicor is to be the exclusive *manufacturer* of bulk doxorubicin sold thereunder. Section 1 of the Second Supply Agreement, for example, states that "SICOR agrees to sell Doxorubicin Hydrochloride conforming to the specifications set out in Appendix 1 to this Agreement ... to CBVT on an exclusive basis." Neither section 1 nor Appendix 1 (i.e., the provisions defining the relevant product, bulk doxorubicin or "compound"), however, limits "compound" to doxorubicin manufactured by Sicor. Conformity with technical specifications, not manufacturing origin, are their exclusive focus.[13]

---

12. It is undisputed that California law governs the parties' claims.

13. We recognize, as did the district court, that section 5(a)(ii) of the Second Supply Agreement warrants in plain language that all compound sold under the agreement shall be "manufactured by Sicor S.p.A. in accordance with applicable manufacturing practice requirements." Further, we agree with the district court's conclusion that the warranty provisions in section 5(c) do not clearly support Sicor's interpretation of the contract. In that section Sicor warrants that "any COMPOUND which comes into its possession or control prior to delivery to CBVT· shall not become in violation of the warranties and

representations made in (a) and (b) at any time prior to the COMPOUND leaving its possession and control." The district court reasonably concluded that section 5(c) is inapplicable to· shortfalls of the sort at issue here involving the quantity, as opposed to quality, of Sicor's deliveries.

While section 5(c) can be read to apply where a nonconforming shipment triggers Sicor's obligation under section 6(c) to use its best efforts to secure "Compound manufactured by an alternative manufacturer," sections 5(c) and 6(c) do not preclude Sicor from selling doxorubicin manufactured by a third party in other events, including production halts or shortfalls of the sort at issue here.

Under California law, a substantial quantum of inconsistency or ambiguity in a contract for the sale of goods is not a prerequisite to consideration of the parties' subsequent conduct. Under section 2202 of California's Commercial Code, terms of a contract involving the sale of goods "may be explained or supplemented ... by course of performance." *Balfour, Guthrie & Co. v. Gourmet Farms,* 166 Cal.Rptr. 422, 426, 108 Cal.App.3d 181, 187 (1980). More specifically, "any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement," Cal.Com.Code § 2208(1), subject to the proviso that "express terms shall control course of performance[.]" Cal.Com.Code § 2208(2).

The record contains substantial evidence that CBVT acquiesced in or even agreed to Sicor's efforts to secure an alternate supplier. Sicor showed that CBVT participated in discussions with Sicor and Mercian, culminating in at least an agreement in principle, regarding the latter's interest in becoming an alternate supplier. Where competing factual inferences are equally plausible regarding the intentions of the parties to an ambiguous contract, summary judgment is inappropriate. *See Miller v. Fairchild Indus., Inc.,* 797 F.2d 727, 735 (9th Cir.1986). The circumstances surrounding Sicor's discussions with Mercian permit conflicting and equally plausible inferences regarding the proper interpretation of the Second Supply Agreement. Accordingly, summary judgment was inappropriate on this issue.

#### b. Notice and Opportunity to Cure

In addition, Sicor's conduct following the closing of its plant in Italy appears to be consistent with the contractual provision intended by the parties to cover supply failures of the sort involved here, *viz.,* the *force majeure* clause in section 7 of the Second Supply Agreement. Section 7 provides that "neither party shall be liable or be in breach of any provision of this Agreement if and to the extent that any failure or delay on its part to perform any obligation hereunder is because of force majeure or any other cause beyond the reasonable control of such party." Section 7 defines such causes to include, *inter alia,* "legal restraints or actions imposed by governmental authorities." Facially, this provision could embrace an injunction or sequestration order, the forms of restraint at issue here.

Section 7 obligates the party restrained by *force majeure* to "move to eliminate the effect thereof to the extent possible." A triable issue thus exists as to whether Sicor, by seeking alternate sources of supply, was acting in conformity with this requirement when CBVT entered into an exclusive arrangement with Erbamont. Section 7 obligates CBVT to accede to such efforts on the part of Sicor, if made "with all reasonable dispatch," for at least one month. In addition, section 8(c) of the Second Supply Agreement requires the parties to meet in the event the condition of *force majeure* persists for one month or longer. Section 8 further provides that if "no settlement is concluded within two additional months regarding future course of action," the party not claiming *force majeure* may terminate the agreement upon written notice to the other party.

The record indicates that Sicor did not receive proper notice of termination as required by section 8(c) until CBVT's letter of April 10, 1991.[14] In this letter CBVT informed Sicor that CBVT would no longer do business with Sicor or Mercian, in keeping with its newly negotiated exclusive relationship with the Farmitalia Group. The record further indicates that, by that date Sicor and CBVT may have agreed, consistently with section 7, to an arrangement whereby third-party suppliers and CBVT's own inventory would cover CBVT's interim needs until

---

14. Prior to this letter, the only communication from CBVT arguably resembling a notice of termination was a letter dated December 6, 1990, from Cetus Corporation to Alco, stating that "we will continue, independently of your efforts, to seek and qualify alternative sources of bulk." Under California law, "[w]hile a notice of termination or cancellation of a contract for breach need not be formal and explicit, it should clearly indicate to the defaulting party that the injured party considers the contract terminated." *Whitney Invest. Co. v. Westview Dev. Co.,* 78 Cal.Rptr. 302, 308, 273 Cal.App.2d 594, 603 (1969). The December 6, 1990 letter did not indicate with the requisite degree of clarity that CBVT intended to terminate the Second Supply Agreement.

CBVT received FDA approval as a finisher of Mercian-produced doxorubicin. Such an agreement would preclude CBVT from withdrawing from the Second Supply Agreement without liability by terminating with notice pursuant to section 8 or cancelling the contract without notice on the basis of impossibility, frustration of purpose or failure to deliver under section 2711 of California's Commercial Code.[15]

Viewed in the context of Sicor's contemporaneous discussions with Mercian and CBVT's representation that its inventory of doxorubicin was not in danger of depletion in the short term, Sicor and CBVT's ratification of the Second Supply Agreement on October 8, 1990, potentially constituted or contributed to an agreement on a future course of action whereby Sicor, pursuant to section 7(c), retained Mercian as an alternate supplier. Viewed in the light most favorable to Sicor, the record permits the inference that Sicor pursued such alternate sources of supply with the "reasonable dispatch" required by section 7, given that Sicor met with Pharmachemie, B.V. for this purpose within three weeks of the sequestration decree imposed by the Milan court on September 21, 1990, and then met with Mercian to the same end shortly thereafter.[16]

Finally, the district court held that "plaintiffs can prove no damages resulting from the alleged breach because they have been incapable of competing in the U.S. bulk doxorubicin market since September of 1990." We find insufficient support in the record for this conclusion. Sicor raised a triable issue of fact as to whether, absent CBVT's termi-nation of the Second Supply Agreement, Sicor could have continued to compete, receive compensation and profit as an intermediary between third party manufacturers and CBVT, notwithstanding the injunction and sequestration order.

In light of the above, and in view of the unresolved questions of fact noted, summary judgment on Sicor's breach of contract claim was improper.

## 2. Oral Agreement

■ Sicor next contends that the district court erred in granting summary judgment to CBVT on Sicor's claim that CBVT breached its oral agreement, entered into simultaneously with the Second Amendment to the Distribution Agreement, to pursue antitrust claims against Erbamont in exchange for Alco's payment of one-half of CBVT's associated litigation costs. Under sections 2(b) and 17 of the Distribution Agreement (as added by the First Amendment and modified by the Second Amendment, respectively), the parties agreed to fund equally the costs of litigation in defense of CBVT's right to distribute doxorubicin purchased under the Second Supply Agreement. Section 17 sets forth various accounting provisions and other terms governing this litigation fund. Sicor contends that the oral agreement modifies section 17 to require CBVT to pursue its antitrust claims against the Farmitalia Group with the utmost diligence, and that CBVT breached this contract in settling its claims against the Farmitalia Group.

---

**15.** Section 2711 provides in relevant part that, "Where the seller fails to make delivery ... the buyer may cancel," in addition to recovering damages for nondelivery and seeking specific performance or replevy. Cal.Com.Code § 2711(1)(b), (2)(b).

**16.** A similar triable issue arises as to whether the parties settled on a "course of action" pursuant to section 7 by virtue of negotiations held between Mercian and Sicor in 1990 and 1991 with the knowledge, if not participation, of CBVT; a memorandum, dated February 22, 1991, circulated between the parties regarding various "marketing scenarios" and launch dates for CBVT's finishing and sale of Mercian-manufactured doxorubicin; and contemporaneous assur-ances from CBVT that Mercian would be an acceptable alternate manufacturer.

Sicor contends that "[n]ot only did Cetus representatives participate in these discussions [with Mercian], they agreed in principle to an arrangement under which Sicor would supply a minimum of 18 kgs of Mercian-manufactured doxorubicin over a three year period." This contention was disputed in the pleadings but was sufficiently founded on declarations submitted by Sicor. Accordingly, a material and unresolved issue persists regarding whether Sicor and CBVT met one month or more after the *force majeure* arose in accordance with sections 7 and 8(c) and, within two months thereof, settled upon a course of action from which CBVT unilaterally deviated in breach of section 8(c).

The district court found that the integration clause set out in section 10 of the Distribution Agreement, which provides that "[v]ariations, alterations and additions to this Agreement shall only be deemed to have become part of this Agreement when it is specifically stated that it has [sic] become part of this Agreement and has [sic] been signed by both parties[,]" effectively precluded consideration of extrinsic evidence of CBVT's agreement to litigate its antitrust claims fully. We disagree.

■■■■ Although the parol evidence rule ordinarily precludes consideration of additional terms where an integrated written contract exists, *see* 1 B. Witkin, *Summary of California Law*, § 268 at 263 (9th ed. 1987), the rule is inapplicable here. Under California law, the parol evidence rule does not "render inadmissible proof of contemporaneous oral agreements collateral to, and not inconsistent with, a written contract where the latter is either incomplete or silent on the subject, and the circumstances justify an inference that it was not intended to constitute a final inclusive statement of the transaction." *Ellis v. Klaff*, 216 P.2d 15, 19, 96 Cal.App.2d 471, 476 (1950). Accordingly, the parties' inclusion of an integration clause in the written contract is but one factor in this analysis. *See Enrico Farms, Inc. v. H.J. Heinz Co.*, 629 F.2d 1304, 1306 (9th Cir.1980) (per curiam) (citing *Masterson v. Sine*, 436 P.2d 561, 65 Cal.Rptr. 545, 68 Cal.2d 222 (1968)).

To determine whether a document is an integrated contract not susceptible to modification by parol evidence under California law, we must consider three additional factors: "the language and completeness of the written agreement[,] the terms of the alleged oral agreement and whether they contradict those in writing, [and] whether the oral agreement might naturally be made as a separate agreement[.]" *McLain v. Great Am. Ins. Cos.*, 256 Cal.Rptr. 863, 867, 208 Cal.App.3d 1476, 1484 (1989) (quoting *Mobil Oil Corp. v. Rossi*, 187 Cal.Rptr. 845, 851–52, 138 Cal.App.3d 256, 266 (1982)).

As to the first additional factor, section 17 does not specify in substantial detail the full range of the parties' obligations to assist one another in defending CBVT's right to distribute doxorubicin in the American market. For example, while section 17 describes fully the mechanics of deposit, withdrawal, and reimbursement, it is silent as to such essential antecedent issues governing when, whether, and to what extent CBVT would be obligated to pursue litigation triggering these provisions. With regard to the second factor, the parol terms proffered by Sicor supplement rather than contradict the accounting provisions in section 17. As to the third factor, the parties might have been expected to reduce to writing an agreement regarding the manner and circumstances in which one would be obligated to pursue jointly funded and mutually beneficial litigation. Notwithstanding this third factor and the integration clause, however, we conclude that on balance the factors set forth in *McLain* militate sufficiently in favor of considering the additional, parol terms to shield Sicor from summary judgment on its claim that CBVT breached their oral agreement.

■■■ The district court gave as an alternative ground for its ruling that, even assuming the existence of such an oral contract, CBVT's promise would be void as a matter of public policy. In doing so, the district court cited Sicor's allegation in the complaint that "CBVT breached the oral agreement by settling all pending litigation against FARMITALIA and ERBAMONT and by agreeing to procure its supply of doxorubicin directly from defendant FARMITALIA." The district court characterized this statement as a judicial admission that the oral agreement obligated CBVT to litigate fully to judgment, an agreement that ran afoul of California's public policy favoring settlement. *See Bush v. Superior Ct.*, 13 Cal.Rptr.2d 382, 388, 10 Cal.App.4th 1374, 1385 (1992).

■■■ The district court is correct that a statement in a complaint may serve as a judicial admission. *See American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir.1988); *Miller v. Lakeside Village Condominium Ass'n*, 2 Cal.Rptr.2d 796, 803, 1 Cal.App.4th 1611, 1623 (1991). Where, however, the party making an ostensible judicial admission explains the error in a subsequent

pleading or by amendment, the trial court must accord the explanation due weight. *See Lacelaw*, 861 F.2d at 226 ("Factual assertions in pleadings and pretrial orders, *unless amended*, are considered judicial admissions conclusively binding on the party who made them.") (emphasis added); *Hooper v. Romero*, 68 Cal.Rptr. 749, 753, 262 Cal.App.2d 574, 580 (1968) (same). In opposing summary judgment, Sicor explained that, "By saying litigation to judgment, the parties did not mean that there would be no settlement[;]" rather, the parties intended only that CBVT would litigate its claims "fully and aggressively" and with Sicor's interests in mind.

We conclude that Sicor retracted its judicial admission by subsequently recharacterizing the alleged oral agreement in its opposition to CBVT's motion for summary judgment. Accordingly, we must remand for consideration of whether the parties' oral agreement implicated the public policy invoked by the district court as an alternative ground in support of its erroneous grant of summary judgment on the oral contract claim.

### 3. Indebitatus Assumpsit

The district court also rejected Sicor's claim seeking $500,000 in restitution to recover amounts Sicor alleged it had contributed to CBVT's litigation against Erbamont. Sicor argued that CBVT's settlement of the litigation with Erbamont was adverse to the appellants' interests and frustrated the purpose of their agreement to fund the litigation. The district court stated that the "claim of indebitatus assumpsit is entirely dependent on the claim of breach of the oral contract." Having ruled that the oral contract was unenforceable, the district court thus granted summary judgment to CBVT on Sicor's claim of indebitatus assumpsit. In light of our conclusion above that the district court should not have granted summary judgment on Sicor's oral contract claim, the premise underlying the district court's ruling on the indebitatus assumpsit claim no longer exists. Accordingly, we must reverse and remand for reconsideration of this claim as well.

### 4. Intentional Interference With Contractual Relations and Prospective Business Advantage

■ Sicor's final contention is that CBVT intentionally interfered with Sicor's contractual and prospective business relations with Mercian by sending a letter to Mercian explaining that CBVT would no longer purchase doxorubicin from or through Sicor. Sicor argued that CBVT intervened with the intent to harm the appellants financially and to induce Mercian to breach its contract with them for the supply of doxorubicin. The district court granted summary judgment to CBVT on these two counts, ruling that, once Sicor was incapable of delivering Sicor-produced doxorubicin, CBVT was no longer under any contractual obligation to purchase bulk doxorubicin from the appellants, much less bulk doxorubicin manufactured by someone else.

■ We agree with the district court that summary judgment was proper as to Count 6, Sicor's tortious interference with contractual relations claim. To recover for intentional interference with contractual relations under California law, a plaintiff must first show that it had a valid and existing contract. *Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys.*, 7 F.3d 1434, 1442 (9th Cir.1993) (interpreting California law). The record does not support Sicor's claim that negotiations with Mercian "were successful and the final terms of a supply agreement were outlined and mutually agreed upon and confirmed between SICOR and Mercian in telefax letters dated November 9, 1990 and December 3, 1990."

Because Sicor did not present these two letters to the district court, we decline to discuss the merits of Farmitalia Group's contention that the letters contained conflicting material terms precluding the existence of a contract; and, as Sicor presented only conclusory allegations concerning the existence of a contract with Mercian, we affirm the district court's dismissal of Count 6.[17] *See*

---

17. Sicor's failure to carry its burden of coming forth with some evidence to support its claim under Count 6 was not the basis for the district court's grant of summary judgment. Neverthe-

*Angel v. Seattle–First Nat'l Bank,* 653 F.2d 1293, 1299 (9th Cir.1981) ("A motion for summary judgment cannot be defeated by mere conclusory allegations unsupported by factual data.").

In contrast, the district court's dismissal of Count 7, Sicor's claim for intentional interference with prospective economic relations, was error. The tort of intentional interference with prospective economic advantage extends liability to "'business relations or advantages which are merely prospective and ordinarily not the subject of an existing contract. The wrong consists of intentional and improper methods of diverting or taking business from another which are not within the privilege of fair competition.'" *Summit Mach. Tool,* 7 F.3d at 1442 (quoting 5 B. Witkin, *Summary of California Law,* § 652 at 740 (9th ed. 1988)). The otherwise similar elements of the two torts differ insofar as "'the existence of a legally binding contract is not a *sine qua non* to the maintenance of a suit based on the more inclusive wrong[,]'" *viz.,* interference with prospective economic advantage. 7 F.3d at 1442 (quoting *Buckaloo v. Johnson,* 537 P.2d 865, 869, 122 Cal.Rptr. 745, 749, 14 Cal.3d 815, 823 (1975)).

For purposes of opposing a Rule 56(c) motion, it is sufficiently evident from the record that Sicor and Mercian were engaged in serious negotiations promising to ripen from an agreement in principle into a binding contract. It is also apparent that CBVT was aware of, and perhaps active in, these negotiations. Sicor plausibly alleged that CBVT's letter to Mercian caused Mercian to break off the negotiations and resulted in injury to Sicor's business reputation, goodwill, and ability to compete in the American doxorubicin market. Therefore, we must reverse the district court's grant of summary judgment as to Count 7.

## CONCLUSION

We affirm the district court's grant of summary judgment with respect to the Sherman Act claims, Counts 1 and 2, and as to the intentional interference with contractual relations claim, Count 6. We reverse the grant of summary judgment with respect to the remaining claims, set out in Counts 3, 4, 5, and 7, and remand for further proceedings.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED. Each side will bear its own costs on appeal.

less, we may affirm a summary judgment on any ground finding support in the record, whether or not relied upon by the trial court. *Jewel Cos. v.*

*Pay Less Drug Stores N.W., Inc.,* 741 F.2d 1555, 1564–65 (9th Cir.1984).